EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** MONROE
-----------------------------------------------------------------x
JOHN SICILIANO, JR.

Plaintiff/Petitioner,

- against -                                      Index No. E2025012925

IMPERIAL BAG AND PAPER CO LLC d/b/a
IMPERIAL DADE; BCPE EMPIRE TOPCO,
INC.

Defendant/Respondent.
-----------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING
### (Mandatory Case)
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

2) You are a Defendant/Respondent (a party) in this case.

● **If you are represented by an attorney:**
Give this Notice to your attorney.  (Attorneys: see "Information for Attorneys" pg. 2).

● **If you are not represented by an attorney:**
**You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

**If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

The **benefits of participating in e-filing** include:

● serving and filing your documents electronically

● free access to view and print your e-filed documents

● limiting your number of trips to the courthouse

● paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

● visit: www.nycourts.gov/efile-unrepresented or
● contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated:  June 10, 2025

Vivek Thiagarajan, Esq.
_____
Name

_____
Firm Name

1088 Bay Road
_____

Webster, NY 14580
_____
Address

804-432-1576
_____
Phone

Vivek@Neutral.Law
_____
E-Mail

To:   IMPERIAL BAG AND PAPER

d/b/a IMPERIAL DADE;

BCPE EMPIRE TOPCO, INC.

2/24/20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE

**JOHN SICILIANO, JR.**

       **Plaintiff,**

**vs.**

**IMPERIAL BAG AND PAPER CO. LLC**

**d/b/a IMPERIAL DADE,**

**BCPE EMPIRE NEW TOPCO, INC.**

          Defendants

**Plaintiff designates
Monroe County as the
place of trial. Venue is
based upon the location
of the company.**

**SUMMONS
Index Number:**

## SUMMONS

To the above-named Defendants:

YOU ARE HEREBY SUMMONED and are required to submit to the Plaintiff's attorney your answering papers to these claims within the time provided in the Complaint annexed hereto. In case of your failure to submit answering papers, default judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: June 10, 2025

Vivek J. Thiagarajan, Esq.
1088 Bay Road, Webster, NY 14580
1-804-432-1576

STATE OF NEW YORK COUNTY OF MONROE
SUPREME COURT

---

**JOHN SICILIANO, JR.**

                Plaintiff,

v.

**IMPERIAL BAG AND PAPER CO. LLC**

**d/b/a IMPERIAL DADE,**

**BCPE EMPIRE NEW TOPCO, INC.**

              Defendants

**VERIFIED COMPLAINT**

---

    Plaintiff, John Siciliano, Jr. ("Plaintiff") by and through his attorney, Vivek J. Thiagarajan,

Esq., complains of the Defendants, Imperial Bag and Paper Co. LLC d/b/a Imperial Dade

("Imperial Dade") and BCPE Empire New Topco, Inc. ("BCPE")(Collectively "Defendants") as

follows:

### PARTIES

    1.    John Siciliano, Jr. is the Plaintiff in this matter and was a former employee of

Defendant, working out of the company's regional office of 3G Packaging at 622 Hollenbeck

Street, Rochester, NY 14621.

    2.    Imperial Dade is a Defendant in this matter and Plaintiff's former employer having

an office address of 255 Route 1 & 9, Jersey City, NJ 07306.

    3.    BCPE is a Defendant in this matter and is the majority owner of Imperial Dade, the

Co-Defendant in this matter, and has an office address of 255 Route 1 & 9, Jersey City, NJ 07306.

    4.    For the purposes of the claims made herein, the actions of Imperial Dade and

BCPE—as its majority owner—are connected by ownership interest and are considered to be one

2

and the same for the purposes of liability, as actions taken are on a false pretext in order to enact the Defendants' plans to terminate Plaintiff.

## JURISDICTION AND STATUTE OF LIMITATIONS

5.    Jurisdiction resides with this Court and in this venue as the issues between the parties are to be brought pursuant to the laws of the State of New York and in the Courts located therein pursuant to Section 14(d) of the contract between the parties, and Plaintiff's workplace is located in Monroe County, State of New York.

6.    The statute of limitations on this claim has not expired as of this present date.

## RELEVANT FACTS

7.    On or about May 14, 2024, Plaintiff and Defendant, Imperial Dade, signed an employment agreement (the "Employment Agreement") that contained certain terms and conditions of the Plaintiff's employment. See **Exhibit A**.

8.    It was Plaintiff's understanding after reviewing such version with counsel that the Employment Agreement provided him certain rights regarding severance, termination, and limitations on the noncompete provisions which prevented the noncompete from being enforced post-termination.

9.    Plaintiff continued to be employed with Defendant, Imperial Dade, for approximately one calendar year without incident, issue, write up, PIP, or other issue of which the Plaintiff was made aware for which he would be subject to discipline or termination.

10.    However, during this time Mr. Oscar Garcia, the Northeast Manager of Defendant, Imperial Dade (the "Northeast Manager") showed disdain and dislike for Plaintiff, making comments about his salary and insensitive comments about his medical conditions, at times likening Plaintiff's insulin injections to shooting up cocaine.

11.    Upon information and belief, Defendant, Imperial Dade—through its Northeast

3

Manager—sought to find pretext and cause to terminate Plaintiff in order to shortcut the Defendants' requirement to pay Plaintiff severance and other benefits.

12.     On or about May 21, 2025, Imperial Dade did just that, terminating Plaintiff, allegedly for misconduct.

13.     However, the alleged misconduct was that Plaintiff had allegedly failed to escalate an issue, which is not only false (as Plaintiff reported the issue to his supervisor per the company code of conduct), but did not directly or personally involve Plaintiff in any way.

14.     Citing his termination, Defendants did not allow Plaintiff to clean out his desk or take his personal items, which included insulin equipment and a valuable cryptocurrency ledger which contained approximately $400,000.00 in cryptocurrency (the "Crypto Ledger").

15.     Plaintiff left without incident but sent a text message to the Northeast Manager demanding that his items be sent to him, which the Northeast Manager agreed to in writing.

16.     However, upon receiving the items, Plaintiff discovered that the Crypto Ledger was not contained in the items that were provided to him and still, upon information and belief, is in possession and control of Defendants or one of their agents, officers, or employees.

17.     On May 21, 2025, before Plaintiff even received a formal termination letter, Plaintiff received an email from Joshua Brand, Assistant General Counsel for Imperial Dade, with two attachments, one of which was a letter reminding Plaintiff about the alleged terms of the noncompete (the "Noncompete Letter") and the other of which was a copy of the alleged agreement between the parties. See Email attached as **Exhibit B**, with attachments including the Noncompete Letter (separately appended hereto as **Exhibit C**) and the Employment Agreement (separately appended as Exhibit A).

18.     Joshua Brand's interpretation of the Employment Agreement attempts to restrict Plaintiff—despite his wrongful termination—from engaging in any position which is "similar in

4

function or purpose to, the service offerings and products of the 3G Packaging Division of the Company." See Exhibit A, Section 9(b)(ii).

19.    Such conduct would allegedly be prohibited for a range of 100 miles from the Plaintiff's worksite as well (See Exhibit A, Section 9(b)(iii) meaning that the Plaintiff would be unable to work anywhere in Rochester, Buffalo, Toronto, or anywhere in between in an unreasonably large geographical area. See **Exhibit D**.

20.    On May 23, 2025, Defendants—through Imperial Dade's Regional Vice President, Joseph LoPresti—sent Plaintiff a letter memorializing this termination "due to misconduct" without providing any further details as to the alleged misconduct, and advising Plaintiff that his benefits would be ending immediately. See "Termination Letter" attached as **Exhibit E**.

21.    The Termination Letter also stated that his healthcare coverage would be cut off and that he could "expect a package regarding continuation of healthcare benefits (COBRA) within the next 14 business days. See Exhibit E.

22.    Not only has this package not arrived even as of this present date—leaving Plaintiff without health insurance for himself or his children, one of whom has special needs that require consistent doctors' visits—but he was provided no severance whatsoever.

23.    Under the terms of the Employment Agreement, Plaintiff is entitled to certain severance benefits unless Defendants can show that Plaintiff "has engaged in personal misconduct which interferes with or jeopardizes the business of any member of the Company Group." See Exhibit E, Section 6(a)(ii)(C).

24.    Plaintiff—through counsel—sent a demand letter and preservation notice to Defendant, Imperial Dade. See **Exhibit F**.

25.    On or about June 6, 2025, Plaintiff had a conversation over the phone with the Imperial Dade's assistant general counsel, Joshua Brand, who expressed that Plaintiff would not

be paid anything, no settlement would be negotiated, and his Crypto Ledger would not be returned as his position was that Defendants were not aware of its location despite having been last in its possession and Defendants having been in charge of its transfer to the Plaintiff.

26.     Defendants—through Imperial Dade's assistant general counsel—also represented that it would seek enforcement of the noncompete provisions in the agreement, despite the harm caused to Plaintiff by such actions.

27.     Pursuant to Imperial Dade's own code of conduct, Plaintiff should have never been fired in the first place, much less had a noncompete enforced against him, as the company's own code of conduct states that "if you have a good faith belief that a potential violation of the Code of Conduct has occurred, you must report the incident promptly to your supervisor, Imperial Dade Legal (at legal@ImperialDade.Com) , or the Imperial Dade Confidential Employee and Supplier Hotline (the "Hotline"). See "Company Code of Conduct" attached as **Exhibit G**.

28.     The Company Code of Conduct also states that Imperial Dade "prohibits any form of discipline, reprisal, intimidation, or retaliation for reporting a potential violation of the Code of Conduct or cooperating in related investigations, provided that the report is made in good faith and with a reasonable belief that the information submitted is true." See Exhibit G, Page 7.

29.     As such, this instant action is being brought as the Defendants have not only terminated the Plaintiff as a result of his following company policy, but has refused to negotiate or provide the Plaintiff with even a scintilla of his rights under the Employment Agreement, leaving him with no choice.

30.     Based on the foregoing, Defendants have infringed upon Plaintiff's rights and caused him damage and harm as is more fully expressed in the below causes of action.

6

Case 6:25-cv-06307-EAW    Document 2-1    Filed 06/12/25    Page 9 of 71

## FIRST CAUSE OF ACTION
### Breach of Contract

31.    Plaintiff repeats and realleges the relevant facts set forth in the preceding paragraphs as if fully set forth in this cause of action.

32.    Plaintiff and Defendant, Imperial Dade, have a valid contract between them, namely the Employment Agreement.

33.    Defendant, Imperial Dade, is in breach of such agreement for failing to make payment to the Plaintiff of certain contractual benefits, which has damaged the Plaintiff.

34.    Specifically, the Plaintiff was allegedly terminated for vague "misconduct" for allegedly failing to escalate an issue.

35.    While Defendant, Imperial Dade, claimed to terminate Plaintiff with cause pursuant to Section 6(a)(ii) of the Employment Agreement, such cause must include "personal misconduct which interferes with or jeopardizes the business of any member of the Company Group" which was neither alleged much less proven.

36.    Defendant, Imperial Dade, failed to provide any specific allegations or evidence of actual personal misconduct that would qualify under this category.

37.    Instead, Imperial Dade relies on Plaintiff's alleged failure to escalate an issue, when in fact Plaintiff followed the Company Code of Conduct to the letter in reporting the issue and was terminated for doing so.

38.    As such, having failed to properly allege or prove "misconduct" under the agreement, Plaintiff should be deemed to have been terminated without cause, which triggers certain benefits which the Plaintiff was not provided.

39.    Upon information and belief, Defendant, Imperial Dade, intentionally made false and incomplete allegations of misconduct for this very reason, to avoid having to pay the Plaintiff

7

his contractual benefits.

40.      As such, Plaintiff is entitled to damages and/or specific performance by Defendant, Imperial Dade, of the provisions in Section 7(a)(i-vi) of the Employment Agreement, including but not being limited to:

      (a) Any performance bonuses for the current calendar year;
      (b) Any salary earned but unpaid;
      (c) Any earned but unused vacation days or paid time off;
      (d) Accrued and unpaid employee benefits;
      (e) The opportunity to sign a separation agreement which would entitle him to equal installments of his then-current salary for the remainder of the Term, in addition to an extra 6 months, totaling approximately twenty-four months (May 2025 through May 2027) and an additional six (6) months for a total of thirty months at a pro-rated rate of $27,500 per month, totaling approximately $825,000.00, plus all applicable benefits, bonuses, and other compensation as provided in the Employment Agreement.

## SECOND CAUSE OF ACTION
### Wrongful Termination - Retaliation

41.      Plaintiff repeats and reallege the relevant facts set forth in the preceding paragraphs as if fully set forth in this cause of action.

42.      A coworker notified Plaintiff of a potential situation that her and another co-worker had been involved in after a company party, and such coworker was referred to Plaintiff as a friend by Jeremiah Sands, the Operations Manager.

43.      This friend was unsure of what had happened or what to do and the Plaintiff advised her that she should call the police if she felt that something illegal had occurred.

44.      Plaintiff then reported the issue to his direct supervisor, Vincent Stango, in an effort to ensure that management was aware of the report, even if the individual was unsure of what had happened or had not happened.

45.      In doing so, Plaintiff followed the company policy as laid out in the Company Code

8

of Conduct.

46.     At a later date, Plaintiff was interviewed regarding the situation and was specifically told that any information he shared would not be used to retaliate against him, as is memorialized in the same section of the Company Code of Conduct.

47.     However, the information he shared was then specifically used to terminate him for cause when in fact Plaintiff followed the Company Code of Conduct to the letter by reporting the issue in good faith to his supervisor.

48.     Based on the retaliatory nature of this conduct—as well as the Northeast Manager's negative predisposition towards him—Plaintiff was wrongfully terminated in a manner inconsistent with the contract between the parties.

49.     As such, Plaintiff is entitled to compensatory, actual, and punitive damages based on Defendant, Imperial Dade's wrongful termination for emotional distress, psychological distress, and financial harm.

### THIRD CAUSE OF ACTION
**Declaratory Judgment – Against all Defendants**

50.     Plaintiff repeats and realleges the relevant facts set forth in the preceding paragraphs as if fully set forth in this cause of action.

51.     Defendants alleged to have terminated Plaintiff for "misconduct" and as such term is not defined in the contract between the parties.

52.     Defendants allege that reporting a potentially serious issue to his direct supervisor classifies as misconduct.

53.     To define this reporting in this manner not only enabled the Defendants' scheme to wrongfully terminate the Plaintiff, but sets a concerning precedent that would define reports of complaints as misconduct in and of themselves, subjecting Plaintiff and other employees to an

9

impossible situation that disincentivizes employees reporting issues, complaints, or conduct for fear of legal action.

54.    The actions of the Defendants are also strictly against the terms of the Company Code of Conduct which prohibit retaliation. See Exhibit G, Page 7.

55.    A final judgment as to the rights and other legal relations of the parties to this justiciable controversy directly affect Plaintiff's rights and Court intervention is warranted.

56.    As such, Plaintiff is entitled to a declaratory judgment stating that the definition of misconduct does not include reporting allegations to Plaintiff's supervisor in compliance with the Company Code of Conduct, and that Plaintiff's conduct does not qualify as misconduct, much less personal misconduct that harms the Defendants or their business.

### FOURTH CAUSE OF ACTION
**Conversion – Against All Defendants**

57.    Plaintiff repeats and reallege the relevant facts set forth in the preceding paragraphs as if fully set forth in this cause of action.

58.    Plaintiff possessed and had title to the Ledger, which was valued at approximately $400,000.00 at the time that it was taken.

59.    Defendants and/or their agents took possession of such property by first refusing to allow Plaintiff to clean out his desk at work, then by failing to return the property to him, despite due demand made.

60.    Such actions interfered with Plaintiff's rights and were in derogation of and were inconsistent with Plaintiff's rights.

61.    Defendants have wrongfully exercised dominion over Plaintiff's personal property, specifically his Crypto Ledger containing approximately $400,000.00 in cryptocurrency, in a manner inconsistent with Plaintiff's rights.

10

62.     Despite demands for return of the property, Defendants have failed and refused to return Plaintiff's property.

63.     As a direct result of Defendants' wrongful conversion of Plaintiff's property, Plaintiff has suffered damages in an amount to be determined at trial but believed to be not less than $400,000.00.

### FIFTH CAUSE OF ACTION
**Injunctive Relief**

64.     Plaintiff repeats and reallege the relevant facts set forth in the preceding paragraphs as if fully set forth in this cause of action.

65.     Defendants' conduct in the previous causes of actions create an emergency, hazardous situation for the Plaintiff, as he is without severance, income, access to insurance, ability to work without violating the alleged noncompete, and lack of access to his valuable property.

66.     Plaintiff is likely to succeed on the merits of his claims, as Defendants have breached explicit contract terms or otherwise acted wrongly, have taken Plaintiff's property, and have failed to provide him with the health insurance information it stated that it would provide even in Imperial Dade's own letter.

67.     Irreparable harm has been—and will continue to be—caused to the Plaintiff as he has been cut off from both his current income stream and future ability to work, leaving him in an impossible financial situation exacerbated by the inability to access health insurance, and absent injunctive relief this harm will continue.

68.     The equities balance here in favor of Plaintiff, an employee who has been left with no financial options after being wrongfully terminated in a manner inconsistent with the employment contract signed between the parties.

69.     The status quo—namely that Plaintiff be allowed access to an income stream and

11

access to his contractual and property rights—should be restored.

70.     As such, Plaintiff is entitled to Injunctive Relief—pursuant to the Order to Show Cause appended hereto—to the following effect:

      a. Enjoining Defendants from enforcing Section 9 of the Employment Agreement.
      b. Compelling the return of Plaintiff's property alleged to have been converted.
      c. Enjoining Defendants from enforcing Section 9 of the Employment Agreement.

## SIXTH CAUSE OF ACTION
### Attorneys' Fees

71.     Plaintiff repeats and reallege the relevant facts set forth in the preceding paragraphs as if fully set forth in this cause of action.

72.     Pursuant to Section 14(g) of the Employment Agreement, the "substantially prevailing party" is entitled to have its attorneys' fees paid by the other party.

73.     Based on the likelihood of success on these claims—as demonstrated by the Order to Show Cause filed herewith, Plaintiff is entitled to attorneys' fees pursuant to Section 14(g) of the Employment Agreement in an amount to be substantiated by an attorney affirmation at the conclusion of this matter.

74.     Based on the frivolous conduct of the Defendants—including making false claims without merit in law or fact which are calculated to harass and/or injure the Plaintiff—Plaintiff is also entitled to have his attorneys' fees paid pursuant to 22 NYCRR 130-1.1.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, as follows:

A.     Specific performance Defendant Imperial Dade of the provisions in Section 7(a)(i-vi) of the Employment Agreement based on Defendant's breaches of such contract as alleged in Plaintiff's First Cause of Action;

B.     Damages based on Defendant Imperial Dade's wrongful termination as alleged in Plaintiff's Second Cause of Action;

C.     A declaratory judgment from this Court that it was not misconduct under the Employment Agreement to report the allegations to Plaintiff's supervisor in the absence of any written policies requiring other or further action by Plaintiff, pursuant to Plaintiff's

12

Third Cause of Action;

      D.     The return of Plaintiff's converted property or, in the alternative, damages in the amount of the value of such property as alleged in Plaintiff's Fourth Cause of Action;

      E.     Injunctive Relief pursuant to the Order to Show Cause appended hereto enjoining Defendants from enforcing Section 9 of the Employment Agreement, pursuant to Plaintiff's Fifth Cause of Action herein.

      F.     Injunctive Relief pursuant to the Order to Show Cause appended hereto compelling the return of Plaintiff's property, pursuant to Plaintiff's Fifth Cause of Action herein.

      G.     Attorneys' fees pursuant to both 22 NYCRR 130-1.1 and Section 14(g) of the Employment Agreement, as alleged in Plaintiff's Sixth Cause of Action;

      H.     For such other and further relief as the Court deems just and proper, having regard for the circumstances of the case and the parties therein.

Dated: 6/10/2025

Vivek J. Thiagarajan, Esq.
Attorney for the Plaintiff
1088 Bay Road, Webster, NY 14580
(804) 432-1576

13

## VERIFICATION

STATE OF NEW YORK    }
COUNTY OF MONROE    } ss:

    John Siciliano, Jr., hereby affirms under penalties of perjury affirms and states: that affirmant is the Plaintiff in the within matter; that affirmant has read the within Verified Complaint and knows the contents thereof, and that the same is true to affirmant's knowledge except as to matters therein stated to be alleged upon information and belief, and that as to such matters deponent believes them to be true.

_____
John Siciliano, Jr.

14

**EXECUTION COPY**

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "Agreement") is made as of May 15, 2024 (the "Effective Date"), by and between Imperial Bag & Paper Co. LLC, a Delaware limited liability company (the "Company"), and John Siciliano, an individual employed in the State of New York ("Employee", and together with the Company, collectively, the "Parties", and each individually, a "Party").

A.      The Company desires to employ Employee in accordance with the terms and conditions set forth herein.

B.      Employee desires to be employed by the Company in accordance with the terms and conditions set forth herein.

C.      On the Effective Date, the Company is acquiring certain of the assets and properties and assuming certain of the liabilities of 3G Packaging, Inc., a New York corporation ("3G"), on the terms and subject to the conditions of that certain Asset Purchase Agreement, dated the Effective Date (as amended, restated, or otherwise modified from time to time, the "Purchase Agreement"), by and among the Company, 3G, and Vincent Stango, and Employee's entrance into this Agreement is a condition to, and is in consideration of, the Company's willingness to enter into the Purchase Agreement and consummate the transactions contemplated thereby.

Therefore, the Parties hereby agree as follows:

1.      Employment.  The Company hereby employs Employee, and Employee hereby agrees to serve the Company, as Branch Manager of the Company's 3G Packaging Division, reporting to the Company's President North East Region, pursuant to the terms and conditions of this Agreement.

2.      Term.  Subject to earlier termination as provided in Section 6, this Agreement and Employee's employment with the Company shall commence on the Effective Date and this Agreement shall continue for a period of thirty-six (36) months thereafter, with this Agreement (and, subject to Section 14(m)), all rights and obligations of the Parties hereunder) expiring and terminating, automatically without any further action on the part of either Party, on the day immediately preceding the date that is the thirty-six (36)-month anniversary of the Effective Date (the "Term").  To the extent that Employee's employment with the Company has not terminated prior to the expiration of the Term, and subject to Section 14(m), Employee shall remain employed by the Company following the expiration of the Term and the termination of this Agreement, and Employee shall be considered, at all relevant times thereafter, an "at will" employee of the Company and may be terminated at any time, for any reason, with or without cause or prior notice, and without the payment of any severance, separation, or other compensation, except as required by law or pursuant to applicable Company policy.

3.      Duties.  During Employee's employment with the Company, Employee shall, at all times:  (a) comply with the terms and conditions set forth in this Agreement; (b) perform and carry out such duties and responsibilities as are consistent with Employee's job title as well as such other duties and responsibilities as the Company may direct, designate, request of, or assign to Employee from time to time; (c) comply with and abide by the Company's policies, practices, and procedures

(as may be amended or otherwise modified from time to time by the Company); and (d) comply with all laws, rules, and regulations that may be applicable to Employee's employment with the Company. Employee shall, in good faith, devote substantially all of Employee's working time, attention, skills, and efforts consistent with this Agreement to the Company's business, and shall exert Employee's best efforts to promote the interests of the Company in connection therewith. Notwithstanding the foregoing, or any other provision of this Agreement, it shall not be a breach or violation of this Agreement for Employee to (i) be involved with and manage Employee's personal, financial, and legal affairs, including passive investments (e.g., real estate rental properties and publicly traded investments), and (ii) serve on civic or charitable boards or committees so long as such activities, in each case of (i) and (ii), do not interfere with or detract from the performance of Employee's responsibilities for the Company in accordance with this Agreement or constitute a breach of the restrictive covenants set forth in <u>Section 9</u> of this Agreement.

4.     <u>No Conflicts</u>. Employee hereby represents, warrants, and covenants that, on and as of the Effective Date, Employee will not be a party or subject to any non-competition, non-solicitation, or any other restrictive covenants, other than arrangements between Employee and the Company or any of its subsidiaries or Affiliates (as defined below) (the Company, together with its subsidiaries and Affiliates, collectively, the "<u>Company Group</u>") and other than arrangements disclosed in writing to the Company (the "<u>Prior Covenants</u>"), which could give rise to any liability to any other person or entity relating to or arising out of the Company's recruitment or employment of, or other dealings with, Employee. Further, Employee shall not engage in any conduct during Employee's employment with the Company that could give rise to any claim that such conduct violates any Prior Covenants. Additionally, Employee shall not knowingly infringe, dilute, or misappropriate any proprietary rights of any third parties, including, but not limited to, patent, copyright, or trade secret rights, in the performance of Employee's duties in connection with Employee's employment with the Company. Employee does not have in Employee's possession, and will not use or disclose in the performance of Employee's duties in connection with Employee's employment with the Company, any confidential or trade secret information of any third parties, excluding 3G, which such confidential information has been acquired by the Company pursuant to the Purchase Agreement. As used herein, "<u>Affiliate</u>", with respect to a person or entity, means any other person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such person or affiliate; and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract, or otherwise.

5.     <u>Compensation and Benefits</u>. Subject to the terms and conditions of this Agreement, and in consideration for the services to be provided hereunder by Employee, the Company hereby agrees to pay Employee the following compensation during the Term:

(a)     <u>Salary</u>. The Company agrees to pay Employee for services to the Company hereunder a salary at the rate of Three Hundred Thirty Thousand and No/100 US Dollars ($330,000.00) per annum (the "<u>Salary</u>"), payable in accordance with the Company's customary payroll practices. The Salary may be reviewed by the Company from time to time and may be subject to upward or downward adjustment, in the Company's sole discretion, based upon

a review and consideration of various factors, including, but not limited to, Employee's performance and/or the Company's overall financial performance; provided, however, that the Salary will not be subject to downward adjustment during the Term.

    (b)    <u>Performance Bonus</u>.

    (i)    Employee shall be entitled to participate in the Company's annual bonus program, at a range of up to ten percent (10%) of Employee's Salary (the "<u>Performance Bonus</u>"). The amount, if any, of Employee's Performance Bonus shall be determined in the Company's sole discretion based upon factors including the Company's achievement of its performance targets and Employee's achievement of individual performance targets, in each case, as determined by the board of directors of BCPE Empire New Topco, Inc., a Delaware corporation and the indirect parent entity of the Company, or one of its Affiliates, for each calendar year. Payment of any Performance Bonus under this <u>Section 5(b)(i)</u> for a calendar year shall be made on or prior to March 15 of the calendar year following the end of such calendar year, when bonuses are generally paid to similarly situated employees of the Company. Except as otherwise set forth in <u>Section 5(b)(ii)</u> or <u>Section 7(a)</u>, Employee's earning and the Company's payment of any Performance Bonus is conditioned on Employee remaining employed by the Company through the payment date of such Performance Bonus. For calendar year 2024, any Performance Bonus earned by Employee under the terms of this <u>Section 5(b)(i)</u> will be pro-rated based on the number of months Employee is employed by the Company during calendar year 2024.

    (ii)    If Employee's employment terminates before the end of the applicable calendar year pursuant to <u>Section 7(a)</u> below, then upon the satisfaction of the requirements of <u>Section 7</u>, the Company in its sole discretion may award Employee a portion of any Performance Bonus that it may have otherwise granted Employee, pro-rated based on the number of months Employee is employed by the Company during such calendar year (the "<u>Pro Rated Performance Bonus</u>"). Payment of any Pro Rated Performance Bonus under this <u>Section 5(b)(ii)</u> for a calendar year shall be made on or prior to March 15 of the calendar year following the end of such calendar year, when bonuses are generally paid to similarly situated employees of the Company.

    (c)    <u>Participation in Employee Benefits Plans</u>. Employee will be entitled to participate in the employee benefit plans from time to time in effect for employees of the Company generally (excluding any severance plans), except to the extent such plans are duplicative of benefits otherwise provided to Employee under this Agreement. Employee's participation will be subject to the eligibility requirements, enrollment criteria, and other terms and conditions of the applicable plans and generally applicable Company policies, as may be in effect from time to time, and any other restrictions or limitations imposed by law. Employee acknowledges that the Company in its discretion may modify or terminate any or all of its benefit plans at any time, subject to the terms and conditions of such plans and applicable federal, state, and local law.

    (d)    <u>Vacations</u>. Employee will be entitled to twenty (20) days of vacation per calendar year, in addition to holidays observed by the Company. Vacation may be taken at such times and intervals as Employee will determine, subject to the business needs of the Company as

reasonably determined by the Company's President North East Region; provided, that Employee may not take more than ten (10) days of vacation consecutively in any particular calendar year without the prior written consent (email being sufficient) of the Company's President North East Region. Vacation shall otherwise be subject to the policies of the Company, as in effect from time to time. For calendar year 2024, Employee's vacation will be pro-rated based on the number of months Employee is employed by the Company during calendar year 2024.

(e)     Business Expenses. The Company will pay to Employee $475.00 per paycheck during the Term, payable in accordance with the Company's customary payroll practices, towards the reimbursement for Employee's out-of-pocket expenses related to Employee's car, car insurance, phone, and phone service incurred or paid by Employee in the performance of Employee's duties and responsibilities for the Company. Without duplication of the expense reimbursement provided under the first sentence of this Section 5(e), the Company will reimburse Employee for the reasonable and necessary business expenses, e.g., out-of-pocket travel, meal, and lodging expenses incurred by Employee in the performance of Employee's duties hereunder and pre-approved in advance in writing (email being sufficient) by a senior executive officer of the Company (the "Expenses"). To the extent requested by the Company, Employee will provide the Company with reasonable documentation of the Expenses as requested by the Company. For an Expense to be eligible for reimbursement under this Section 5(e), Employee must submit to the Company a written request for reimbursement along with any requested reasonable documentation of the Expense within thirty (30) days of incurring the Expense.

(f)     Withholding. All amounts to be paid to Employee under Sections 5(a) – 5(e) shall be subject to any applicable taxes, withholdings, and deductions (if any), and any other deductions that may be authorized by Employee, from time to time, in accordance with applicable federal, state, and/or local law.

6.     Termination.

(a)     Events of Termination. Prior to the expiration of the Term, the Company and Employee agree that this Agreement (subject to Section 14(m)), and Employee's employment with the Company, shall terminate upon the earliest to occur of the following events:

(i)     mutual written agreement of the Company and Employee;

(ii)     termination of Employee's employment by the Company with Cause (as defined below);

(iii)     termination of Employee's employment by the Company without Cause;

(iv)     termination of Employee's employment by Employee for Good Reason in accordance with this Section 6(a)(iv). For purposes of this Agreement, the term "Good Reason" means, without the consent of Employee: (A) a material diminution of Employee's job responsibilities as such responsibilities exist as of the Effective Date; (B) a material reduction in Employee's Salary, unless such reduction is part of a reduction in compensation for all similarly situated employees of the Company in general (provided, that the Salary will not be subject to downward adjustment during the Term); or (C) a

relocation of Employee's principal place of employment by more than seventy-five (75) miles. Notwithstanding the foregoing, Good Reason shall not be deemed to exist unless: (x) Cause does not exist; and (y) Employee gives the Company written notice of the specific event or condition that Employee believes constitutes Good Reason no later than thirty (30) calendar days after the event or condition purportedly giving rise to Good Reason first occurs or arises; provided, that if there exists an event or condition that constitutes Good Reason, the Company shall have thirty (30) calendar days (the "Cure Period") from the date that such notice is received by the Company to cure such event or condition and, if the Company does so, such event or condition shall not constitute Good Reason hereunder. If, at the end of the Cure Period, the event or condition that constitutes Good Reason has not been remedied, Employee will be entitled to terminate employment for Good Reason by providing written notice thereof during the thirty (30) calendar-day period that follows the end of the Cure Period. If Employee does not provide written notice of termination of employment for Good Reason during such thirty (30) calendar-day period, Employee shall not be permitted to terminate employment for Good Reason as a result of such event or condition;

(v)  termination of Employee's employment by Employee without Good Reason, upon thirty (30) calendar days' prior written notice to the Company;

(vi)  death or Disability of Employee. Employee shall be deemed to have a "Disability" if Employee is unable to perform the essential functions of Employee's position, with or without a reasonable accommodation, for either one hundred twenty (120) consecutive calendar days, or one hundred eighty (180) aggregate calendar days in a twelve (12)-month period, by reason of any physical or mental impairment; or

(vii)  automatically upon expiration of the Term; provided, that in such instance only this Agreement shall terminate (subject to Section 14(m)) and Employee's employment with the Company will continue following the expiration of the Term in accordance with Company policy until terminated by the Company or Employee.

(b)  Termination Date. Prior to the expiration of the Term, this Agreement (subject to Section 14(m)), and Employee's employment with the Company, shall terminate in accordance with the following schedule (as applicable to the particular circumstances surrounding Employee's termination, the "Termination Date"):

(i)  if this Agreement is terminated pursuant to Section 6(a)(i), upon the date that the Parties mutually agree, in writing, to terminate this Agreement and Employee's employment with the Company;

(ii)  if this Agreement is terminated pursuant to Section 6(a)(ii) or Section 6(a)(iii), immediately upon the date when written notice thereof is provided to Employee;

(iii)  if this Agreement is terminated pursuant to Section 6(a)(iv), thirty (30) calendar days after the Company has received written notice thereof from Employee (subject to any applicable cure period);

(iv) if this Agreement is terminated pursuant to Section 6(a)(v), thirty (30) calendar days after the Company has received written notice thereof from Employee, unless the period of notice is waived by the Company in its sole and absolute discretion, in which case this Agreement will terminate immediately upon the date when notice of the Company's election to waive notice is provided to Employee;

(v) immediately upon the date of Employee's death or Disability; or

(vi) if this Agreement is terminated pursuant to Section 6(a)(vii), immediately upon the expiration of the Term; provided, that in such instance only this Agreement shall terminate (subject to Section 14(m)) and Employee's employment with the Company will continue following the expiration of the Term in accordance with Company policy until terminated by the Company or Employee.

7. Effect of Termination.

(a) Termination by the Company without Cause or by Employee for Good Reason during the Term. If this Agreement (subject to Section 14(m)) and Employee's employment with the Company are terminated by the Company without Cause pursuant to Section 6(a)(iii) or by Employee for Good Reason pursuant to Section 6(a)(iv), in each case, prior to the expiration of the Term, then Employee shall receive only:

(i) the Performance Bonus, if any, for any calendar year that ended before the Termination Date throughout which Employee was employed by Company, if such Performance Bonus has not yet been paid to Employee;

(ii) subject to Employee meeting the terms and conditions of Section 7(d) below, the Pro-Rated Performance Bonus, if any, pursuant to Section 5(b)(ii) above;

(iii) any Salary earned but unpaid as of the Termination Date;

(iv) any earned, but unused and unpaid, vacation days and paid time off as of the Termination Date;

(v) such accrued and unpaid employee benefits to which Employee is entitled, if any, as of the Termination Date under the employee benefit plans of the Company in which Employee participates as of the Termination Date (the amounts described in Section 7(a)(iii), Section 7(a)(iv), and this Section 7(a)(v), collectively, the "Accrued Amounts"); and

(vi) subject to Employee executing a Separation Agreement (as defined below) as provided in Section 7(d) below and otherwise satisfying the terms and conditions of Section 7(d) below, an amount equal to the greater of (A) the aggregate of the payments of Employee's then-current Salary (determined as of the Termination Date) throughout the remainder of the Term and (B) six (6) months of Employee's then-current Salary (determined as of the Termination Date), which, in either case of (A) or (B), shall be paid

in substantially equal installments in accordance with the schedule to be set forth in the Separation Agreement.

(b)     <u>Termination with Cause and All Other Terminations, Other than a Termination by the Company without Cause or by Employee for Good Reason during the Term</u>. If this Agreement (subject to <u>Section 14(m)</u>) and Employee's employment with the Company are terminated:  (i) by mutual written agreement of the Company and Employee pursuant to <u>Section 6(a)(i)</u> at any time during the Term; (ii) by the Company with Cause pursuant to <u>Section 6(a)(ii)</u> at any time during the Term; (iii) by Employee pursuant to <u>Section 6(a)(v)</u> at any time during the Term; (iv) by reason of Employee's death or Disability pursuant to <u>Section 6(a)(vi)</u> at any time during the Term; (v) automatically upon expiration of the Term pursuant to <u>Section 6(a)(vii)</u> if not earlier terminated as provided herein; <u>provided</u>, that in such instance only this Agreement shall terminate (subject to <u>Section 14(m)</u>) and Employee's employment with the Company will continue following the expiration of the Term in accordance with Company policy until terminated by the Company or Employee; or (vi) for any reason other than as specified in <u>Section 7(a)</u> at any time during the Term, Employee shall receive only the Accrued Amounts.

(c)     <u>Termination by the Company without Cause following Expiration of the Term</u>. If following the expiration of the Term, the Company terminates Employee's employment without Cause, then, subject to Employee executing a Separation Agreement as provided in <u>Section 7(d)</u> below and otherwise satisfying the terms and conditions of <u>Section 7(d)</u> below, the Company will pay Employee an amount equal to six (6) months of Employee's then-current annual base salary (determined as of the date of such termination of employment), which shall be paid in substantially equal installments in accordance with the schedule to be set forth in the Separation Agreement. For purposes of this Agreement, the term "<u>Cause</u>" means a determination by the Company that Employee: (A) has refused or failed to satisfactorily perform Employee's duties under this Agreement; (B) has breached any fiduciary duty to the Company or any provision of this Agreement or any written agreement or company policy or code of conduct established by any member of the Company Group (as may be amended from time to time); (C) has engaged in personal misconduct which interferes with or jeopardizes the business of any member of the Company Group; (D) has committed an act of theft, fraud, embezzlement, dishonesty, or misappropriation; or (E) has been convicted of (or pleaded no contest to) a crime involving fraud, dishonesty, or moral turpitude or any felony (or a crime of similar import in a foreign jurisdiction).

(d)     <u>Release of Claims against the Company Group</u>.  Notwithstanding the foregoing, no payment shall be made or benefit provided to Employee, as applicable, pursuant to this <u>Section 7</u>, other than the Accrued Amounts, unless (i) Employee signs and, if applicable, does not revoke a separation agreement, containing a general release of all claims against the Company Group and all affiliated persons and entities, in such form as the Company may reasonably require (the "<u>Separation Agreement</u>") and (ii) Employee is not in breach of <u>Section 8</u> or <u>Section 9</u> of this Agreement.  The Separation Agreement must be signed by Employee and returned to the Company within the period designated by the Company, which shall not be more than fifty (50) calendar days after the Termination Date.  Any payment to be made or benefit provided pursuant to this <u>Section 7</u>, other than the Accrued Amounts, shall be tendered in accordance with the schedule to be set forth in the Separation Agreement.

8.    <u>Confidentiality</u>.

(a)    <u>Confidential Information</u>.  Employee acknowledges that during Employee's employment with the Company, and by the nature of Employee's duties and obligations hereunder, the Company agrees to provide, and will provide, Employee with trade secrets and other confidential and proprietary information of the Company Group to which Employee would not otherwise have access in the absence of signing this Agreement, as applicable, including but not limited to:  trade secrets, know-how, Work Product (as defined below), business plans, client/customer lists, pricing methodologies and strategy, cost information, supplier and vendor lists and information, customer routes, supplier and vendor routes, vendor and supplier pricing, bids proposals to customers, bids and proposals from vendors and suppliers, customer contracts, supplier and vendor contracts, price and cost lists, profit margins, customer sales history, supplier and vendor purchase history, operating and overhead costs, catalogs, nonpublic sales and marketing information, products in development, research, algorithms, market intelligence, services in development, technologies, concepts, methods, sources, methods of doing business, patterns, processes, compounds, formulae, programs, devices, tools, compilations of information, Work Product in development, manufacturing processes, purchasing programs and methodologies, engineering schematics and drawings, computer programs (whether in source code or object code), databases, techniques, procedures, strategies, systems, designs, works of art, the identity of and any information concerning Affiliates or customers or suppliers, or potential customers and suppliers, key contact persons at customers, vendors, and suppliers, customer and customer key contact specifications and other requirements, information received from others that any member of the Company Group is obligated to treat as confidential or proprietary, and any other technical, operational, non-public financial, and other business information that has commercial value, whether relating to any member of the Company Group, its business, potential business, or operations, or the business of any clients, customers, suppliers, or vendors of any member of the Company Group, that Employee may develop or of which Employee may acquire knowledge during Employee's employment with the Company, whether prior to, during, or subsequent to Employee's execution of this Agreement, and all other business affairs, methods, and information not readily available to the public (collectively, "<u>Confidential Information</u>").  Confidential Information does not include information that: (i) has been or becomes publicly known through no fault of Employee or other improper means; (ii) at the time of disclosure is, or thereafter becomes, available to Employee on a non-confidential basis from a third-party source (other than any member of the Company Group); <u>provided</u>, that such third party is not and was not prohibited from disclosing such Confidential Information to Employee by any contractual or fiduciary obligation or other obligation of confidentiality; or (iii) is independently developed by Employee without reference to or use of any of the Confidential Information.

Employee acknowledges and agrees that each and every part of the Confidential Information of the Company Group:  (w) has been developed by a member of the Company Group at significant effort and expense; (x) is sufficiently secret to derive economic value from not being generally known to other parties; (y) is proprietary to and a trade secret of a member of the Company Group and, as such, is a valuable, special, and unique asset of such member of the Company Group; and (z) constitutes a protectable business interest of a member of the Company Group.  Employee further acknowledges and agrees that any unauthorized use or disclosure of any Confidential Information by Employee will cause irreparable harm and loss to one or more members of the Company Group.  Employee acknowledges and agrees that one or more members

of the Company Group own the Confidential Information. Employee agrees not to dispute, contest, or deny any such ownership rights either during or after Employee's employment with the Company.

In recognition of the foregoing, and except as set forth in and subject to Section 8(b), Employee covenants and agrees as follows:

(i)     Employee will use Confidential Information only in the performance of Employee's duties and obligations hereunder for the Company Group. Employee will not use Confidential Information, directly or indirectly, at any time during or after Employee's employment with the Company, for Employee's personal benefit, for the benefit of any other person or entity, or in any manner adverse to the interests of any member of the Company Group. Further, Employee will keep secret all Confidential Information and will not make use of, divulge, or otherwise disclose Confidential Information, directly or indirectly, to anyone outside of the Company Group, except with the Company's prior written consent;

(ii)    Employee will take all necessary and reasonable steps to protect Confidential Information from being disclosed to anyone within the Company Group who does not have a need to know the information and to anyone outside of the Company Group, except with the Company's prior written consent;

(iii)   Employee shall not at any time remove, copy, download, or transmit any information from any member of the Company Group (including to a personal computer, thumb drive, phone, or other electronic storage device or any personal email or cloud storage account), except for the benefit of the Company Group and in accordance with this Agreement and the Company's policies; and

(iv)    immediately upon Employee's termination, and at any time upon the Company's request, Employee shall return to the Company any and all Company Group property and Confidential Information in Employee's possession, custody, or control, whether in electronic or hard copy form.

(b)     Duration of Covenant.    Employee acknowledges and agrees that Employee's obligations under this Section 8 shall remain in effect forever.  Notwithstanding the foregoing, nothing in this Agreement shall be construed as, or shall interfere with, abridge, limit, restrain, or restrict Employee's (or Employee's attorney's) right, without prior authorization from or notification to the Company: (i) to engage in any activity or conduct protected by Section 7 or any other provision of the National Labor Relations Act (and, in fact, Section 8 shall not apply to, among other things, any discussion of Company wages, hours, and working conditions as protected by the National Labor Relations Act and/or any other applicable federal, state, or local law); (ii) to communicate with any federal, state, or local government agency charged with the enforcement and/or investigation of claims of discrimination, harassment, retaliation, improper wage payments, or any other unlawful employment practices under federal, state, or local law, or to file a charge, claim, or complaint with, or participate in or cooperate with any investigation or proceeding conducted by, any such agency; (iii) to report possible violations of federal, state, or local law or regulation to any government agency or entity, including but not limited, to the extent applicable,

to the U.S. Department of Labor, the Department of Justice, the Securities and Exchange Commission (the "SEC"), the National Labor Relations Board, the Congress, and/or any agency Inspector General, or make other disclosures that are protected under the whistleblower provisions of federal, state, or local law or regulation; or (iv) to communicate directly with, respond to any inquiry from, or provide testimony before, to the extent applicable, the SEC, the Financial Industry Regulatory Authority, any other self-regulatory organization, or any other federal, state, or local regulatory authority, regarding this Agreement or its underlying facts or circumstances.

In addition, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (A) is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Further, in the event that Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose the trade secret to Employee's attorney and use the trade secret information in the court proceeding, if Employee: (I) files any document containing the trade secret under seal; and (II) does not disclose the trade secret, except pursuant to court order.

Moreover, nothing in this Agreement prohibits Employee from revealing Confidential Information as required by any applicable law, regulation, judicial or administrative order or decree, or request by other regulatory agency having authority pursuant to the law; provided, however, that except as set forth above, Employee shall first have given reasonable written notice to the Company prior to making such disclosure and shall have cooperated with any attempt by the Company to obtain a protective order or other protection regarding the disclosure of Confidential Information to the extent permitted by applicable law.

9. <u>Restrictive Covenants</u>.

(a) <u>Consideration</u>. In consideration of Employee's employment and continued employment with the Company, the Company Group's entrusting and continuing to entrust to Employee with Confidential Information, the Company Group providing Employee specialized training related to the Company Group's business and/or allowing Employee access to customers and the ability to use and develop goodwill with them, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to the restrictive covenants set forth in this <u>Section 9</u>. Employee acknowledges and agrees that each item of consideration described above independently provides new and valuable consideration for the covenants and restrictions in this Agreement that Employee has not previously received and that Employee would not be entitled to receive unless Employee agreed to the restrictive covenants set forth in this <u>Section 9</u> of this Agreement.

(b) <u>Covenant Not to Compete</u>. In exchange for and ancillary to the promises set forth in this Agreement, Employee agrees that, during Employee's employment and for a period of twelve (12) months after Employee ceases to be employed by the Company for any reason, whether voluntary or involuntary, Employee shall not, directly or indirectly, whether as a principal, director, employee, agent, distributor, representative, equityholder, or otherwise, participate in, work for, or provide services to any position or role with a Competing Business (as defined below)

in the Restricted Area (as defined below) that would involve services, or the supervision of services, that are similar in function or purpose to those Employee performed on behalf of the Company Group during the Look Back Period (as defined below).

As used herein:

(i)    "Competing Business" means any person or entity engaged in, or planning to engage in, the business of providing Competitive Services (as defined below) in the Restricted Area at the relevant date of enforcement.

(ii)    "Competitive Services" means service offerings or products that compete with, or are similar in function or purpose to, the service offerings and products of the 3G Packaging Division of the Company.  The foregoing will not apply to (A) service offerings or products that the Company Group is no longer in the business of providing at the relevant time of enforcement, or (B) service offerings or products that Employee had no involvement in, or exposure to Confidential Information about, during the Look Back Period.

(iii)    "Restricted Area" means the geographic area that is within one hundred (100) miles of the Company Group office or facility in which Employee primarily provided services on behalf of the Company Group during the Lookback Period.  Employee acknowledges and agrees that the Company actively carries on its business within the entirety of the Restricted Area.

(iv)    "Look Back Period" means the last two (2) years of Employee's employment with the Company or such shorter time as Employee has been employed.

(c)    Covenant Not to Solicit, Accept, or Divert Customers.  In exchange for and ancillary to the promises set forth in this Agreement, Employee agrees that, during Employee's employment and for a period of twelve (12) months after Employee ceases to be employed by the Company for any reason, whether voluntary or involuntary, Employee will not, directly or indirectly, (i) solicit, divert (that is, to request or advise any Covered Customer (as defined below) to withdraw or cancel any business with the Company Group in any way, either directly or through the use of others), or accept, for Employee or on behalf of, or in conjunction with, any other person, persons, company, partnership, corporation, or business entity, any business related to any Competitive Services from any Covered Customer of any member of the Company Group; or (ii) solicit, induce, influence, or encourage any Covered Customer or any Company vendor or supplier to terminate or diminish its relationship with any member of the Company Group.  As used herein, "Covered Customer" means any person or entity that does business with any member of the Company Group with whom Employee had business-related contact or about whom Employee received or had access to Confidential Information during the Look Back Period.

(d)    Covenant Not to Solicit Employees.  In exchange for and ancillary to the promises set forth in this Agreement, Employee agrees that, during Employee's employment and for a period of twelve (12) months after Employee ceases to be employed by the Company for any reason, Employee will not directly or indirectly solicit, induce, or cause any Company Group member's employees to leave such Company Group member's employ for any reason, including,

- 11 -

without limitation, to work for Employee or any Competing Business, or otherwise be directly or indirectly involved in hiring a person away from any member of the Company Group.

(e)    <u>Nondisparagement</u>. During Employee's employment with the Company and at all times thereafter, Employee shall not make or otherwise publish in any format or on any platform (including any social media platform), anonymously or attributed, any remarks or statements about the Company Group, the Company Group's products and services, or the Company Group's employees, officers, or equityholders, which are likely to cause harm to any of them, collectively or individually. Filing a charge of discrimination with, or participating in an investigation by, the U.S. Equal Employment Opportunity Commission, an analogous state or local fair employment practices agency, or another governmental agency shall not be considered a violation of the provisions of this <u>Section 9(e)</u>. Likewise, making statements about unlawful acts in the workplace, including unlawful harassment or discrimination or other conduct that Employee has reasonable cause to believe is unlawful shall not be considered a violation of the provisions of this <u>Section 9(e)</u>. Finally, nothing in this <u>Section 9(e)</u> shall prevent Employee from filing an unfair labor practice charge, participating or assisting in an investigation by the National Labor Relations Board, or testifying at a hearing conducted by or under the auspices of the National Labor Relations Board.

(f)    <u>Legitimate Interests</u>.    Employee represents, warrants, agrees, and understands that the covenants and agreements set forth in this <u>Section 9</u> are necessary to protect each Company Group member's legitimate interest in protecting its Confidential Information and goodwill, and are reasonable in their geographic scope, temporal duration, and the type and scope of activities they restrict such that they do not impose a greater restraint on Employee than is necessary to protect such Company Group member's Confidential Information and goodwill.

(g)    <u>Period of Enforcement</u>.  If Employee breaches <u>Section 9(c)</u> or <u>Section 9(d)</u>, then the period during which that section remains in effect shall be extended by the length of time during which such breach occurred or continues to occur.  Additionally, if Employee breaches his fiduciary duty to the Company or has unlawfully taken, physically or electronically, property belonging to the Company, including, without limitation, any Confidential Information, then the period during which <u>Section 9(b)</u> remains in effect shall be extended to a period of two (2) years after Employee ceases to be employed by the Company.

(h)    <u>Severability of Covenants</u>.  If any covenant set forth in this <u>Section 9</u> is found to be invalid or incapable of being enforced for the reason that the duration, geography, or scope thereof is unreasonable, then the Parties agree that any court so declaring the covenant unreasonable shall rewrite the same so as to change the duration, geography, or scope to the maximum time or scope that said court may deem to be reasonable under the circumstances.  If any provision of the covenants contained in this <u>Section 9</u> is found invalid, or incapable of being enforced by reason of law, rule, or public policy, despite the power of the court to judicially rewrite the covenant, the offending covenant shall be severed and all other provisions shall nevertheless remain in full force and effect, and no provision herein shall be dependent upon any other provision.

(i)    <u>Covenants Construed as Independent</u>.  The representations and covenants made by Employee and contained in this <u>Section 9</u> will be construed as ancillary to and

independent of any other provision of this Agreement, and the existence of any claim or cause of action of Employee against any member of the Company Group or any officer, director, or equityholder of any member of the Company Group, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the covenants of Employee contained in this <u>Section 9</u>. In addition, the provisions of this <u>Section 9</u> shall be binding upon Employee in accordance with their terms, notwithstanding the termination of Employee's employment for any reason and shall, likewise, continue to apply and be valid notwithstanding any change in Employee's duties, responsibilities, position, or title.

(i)    <u>Careful Consideration</u>.    Employee acknowledges that Employee has carefully considered the provisions of this <u>Section 9</u>, and agrees that such provisions are fair, reasonable, and not unduly restrictive on Employee, and that Employee has had the right and opportunity to obtain legal advice before agreeing to these terms.

10.    <u>Injunctive Relief</u>.    Employee agrees that it would be difficult to measure any damages caused to the Company Group which might result from any breach by Employee of the covenants and agreements set forth in <u>Section 8</u> and <u>Section 9</u>, and that in any event money damages would be an inadequate remedy for any such breach. Accordingly, and notwithstanding any other provision of this Agreement, Employee agrees that if Employee breaches, or the Company reasonably believes that Employee is likely to breach, <u>Section 8</u> or <u>Section 9</u>, the Company shall be entitled, in addition to all other remedies that it may have, to an injunction or other appropriate equitable relief to restrain any such breach, without showing or proving any actual damage to any member of the Company Group. Any award or relief to the Company may, in the discretion of the court, include the Company's costs and expenses of enforcement (including, but not limited to, reasonable attorneys' fees, court costs, and expenses). Nothing contained in this <u>Section 10</u> or in any other provision of this Agreement shall restrict or limit in any manner the Company's right to seek and obtain any form of relief, legal or equitable, and shall not waive the Company's right to any other relief related to any dispute arising out of this Agreement or related to Employee's employment with the Company.

11.    <u>Intellectual Property</u>.

(a)    Employee understands and agrees that, to the extent permitted by law, all work, papers, reports, documentation, drawings, images, product ideas, service ideas, photographs, negatives, tapes and masters therefor, works of authorship, databases, know-how, processes, algorithms, application program interfaces, computer programs including their source code and object code, prototypes and other materials, and any intellectual property rights therein (collectively, "<u>Work Product</u>"), including, without limitation, any and all such Work Product generated and maintained on any form of electronic media, that Employee generates, either alone or jointly with others, during employment with Company will be considered a "work made for hire" as defined in the Copyright Act (17 U.S.C. § 101), and ownership of any and all copyrights in any and all such Work Product will belong to the Company. In the event that any portion of the Work Product should be deemed not to be a "work made for hire" for any reason, Employee hereby assigns, conveys, transfers, and grants, and agrees to assign, convey, transfer, and grant to the Company all of Employee's right, title, and interest in and to the Work Product and any copyright therein, and agrees to cooperate with the Company in the execution of appropriate instruments assigning and evidencing such ownership rights hereunder. Employee hereby waives any claim

or right under "droit moral" or moral rights to object to the Company's copyright in or use of the Work Product. Any Work Product not generally known to the public shall be deemed Confidential Information and shall be subject to the use and disclosure restrictions herein.

(b)     Employee hereby assigns and agrees to assign to the Company all of Employee's right, title, and interest in and to any discoveries, inventions and improvements, and any intellectual property rights therein (each, an "Invention" and, collectively, "Inventions"), whether patentable or not, that Employee makes, conceives, or suggests, either alone or jointly with others, while employed by the Company and within the scope of such employment or using resources provided by the Company. Any Invention that was made, conceived, or suggested by Employee, either solely or jointly with others, within one (1) year following termination of employment with the Company and that pertains to any Confidential Information or business activity of the Company Group, will be irrefutably presumed to have been made, conceived or suggested in the course of Employee's employment and with the use of the time, materials, or facilities of a member of the Company Group. Any Invention not generally known to the public shall be deemed Confidential Information and shall be subject to the use and disclosure restrictions herein.

(c)     To preclude any possible uncertainty with respect to Inventions and Work Product, Employee has attached hereto as Schedule A a complete list of all Inventions or Work Product that Employee has, alone or jointly with others, made, conceived, or developed, or caused to be made, conceived, or developed prior to the commencement of Employee's employment with the Company, that Employee considers to be Employee's property or the property of third parties, (such Inventions and Work Product collectively referred to as "Prior Inventions" or "Prior Work Product", respectively). If disclosure of any such Prior Invention would cause Employee to violate any prior confidentiality agreement, Employee understands that Employee is not to list such Prior Inventions in such attachment but is only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs, and the fact that full disclosure as to such inventions has not been made for that reason. IF NO SUCH DISCLOSURE IS ATTACHED, EMPLOYEE REPRESENTS AND WARRANTS THAT THERE ARE NO PRIOR INVENTIONS OR PRIOR WORK PRODUCT. If, in the course of Employee's employment with the Company, Employee incorporates a Prior Invention or Prior Work Product into a Company Group product, process, or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use, and sell such Prior Invention or Prior Work Product, as applicable. Notwithstanding the foregoing, Employee agrees that Employee will not incorporate, or permit to be incorporated, any Prior Inventions or Prior Work Product in any Company Group inventions without the Company's prior written consent.

(d)     Employee hereby agrees promptly to disclose all Inventions to the Company and to perform, during and after Employee's employment, all acts deemed necessary or desirable by the Company to permit and assist it, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights, and title throughout the world in the Inventions. Such acts may include, without limitation, the execution and delivery of documents and the provision of assistance or cooperation in legal proceedings. In addition, Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney in fact, to act for and in Employee's behalf and stead, to execute and file any such applications and to perform

all other lawfully permitted acts to further the securing of the Company's rights in and to the Inventions.

(e)    In addition, Employee hereby grants to the Company a license to use, without further compensation or approval from Employee, Employee's name, image, portrait, voice, likeness, and all other rights of publicity, or any derivative or modification thereto that the Company may create, in any and all mediums, now known or hereafter developed; <u>provided</u>, that such use is in relation to the Company's business and consistent with professional business standards, and does not disparage Employee; <u>provided</u>, <u>however</u>, that if written notice is provided to the Company by Employee following termination of Employee's employment (for any reason) requesting that the Company cease using Employee's likeness, the Company shall have thirty (30) calendar days to cease using Employee's likeness in the manner set forth in the notice.

12.    <u>Notices</u>.  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:  (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 12</u>).

If to Employee:

John Siciliano
226 Pine Valley Drive
Rochester, New York 14626
Email:  jackerpak@aol.com

If to the Company:

Imperial Bag & Paper Co. LLC
255 Route 1 & 9
Jersey City, New Jersey 07306
Attention: Legal Department
Email: legal@imperialdade.com

with a copy (which will not constitute notice) to:

Holland & Knight LLP
150 North Riverside Plaza, Suite 2700
Chicago, Illinois 60606
Attention: Morley S. Fortier III
Email: morley.fortier@hklaw.com

13.    <u>Legal Representation</u>.  Employee acknowledges that Employee was advised to consult with, and has had ample opportunity to receive the advice of, independent legal counsel before executing this Agreement – and the Company hereby advises Employee to do so – and that Employee has fully exercised that opportunity to the extent Employee desired.  Employee acknowledges that Employee had ample opportunity to consider this Agreement and to receive an explanation from such legal counsel of the legal nature, effect, ramifications, and consequences of this Agreement.  Employee warrants that Employee has carefully read and considered this Agreement with counsel of Employee's choosing, that Employee understands completely its contents, that Employee understands the significance, nature, effect, and consequences of signing it, and that Employee has agreed to and signed this Agreement knowingly and voluntarily of Employee's own free will, act, and deed, and for full and sufficient consideration.

14.    <u>Additional Provisions</u>.

(a)    If any provision or clause of this Agreement, or any portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision shall not thereby be affected and shall be given full force and effect, without regard to the invalid portion.  It is the intention of the Parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, (including, without limitation, <u>Section 9</u>) to be illegal, invalid, or unenforceable because of the duration of such provision, the area or matter covered thereby, or the scope of the restrictions, such court shall reduce the duration, area, matter, or scope of such provision, and in its reduced form, such provision shall then be enforceable and shall be enforced.

(b)    This Agreement, together with all exhibits and schedules annexed hereto, constitutes the entire agreement between the Parties relating to the subject matter hereof, and supersedes all prior agreements and understandings, whether oral or written, with respect to the same, with the exception of any confidentiality, non-disclosure, non-compete, assignment of proprietary rights, and/or non-solicitation covenants and agreements contained in any agreement(s) entered into by Employee with any member of the Company Group.  In entering into and performing under this Agreement, neither the Company nor Employee has relied upon any promises, representations, or statements except as expressly set forth herein.  No modification, alteration, amendment, revision of, or supplement to this Agreement shall be valid or effective unless the same is memorialized in a writing signed by both Employee and a duly-authorized representative or agent of the Company.  No email correspondence, text message, or any other electronic communication shall constitute a writing for purposes of this <u>Section 14(b)</u>.

(c)    This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles.

(d)    TO THE EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR, IF SUCH COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, ANY NEW YORK STATE COURT LOCATED IN THE COUNTY WHERE EMPLOYEE WAS EMPLOYED AT THE TERMINATION OF EMPLOYEE'S EMPLOYMENT AND, IN EACH CASE, THE APPELLATE COURTS THEREFROM, OVER

ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT BY ANY PARTY ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY (I) AGREES THAT ALL CLAIMS WITH RESPECT TO ANY SUCH SUIT, ACTION, OR OTHER PROCEEDING SHALL BE HEARD AND DETERMINED BY ANY SUCH COURT AND (II) WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH SUIT, ACTION, OR OTHER PROCEEDING IN ANY SUCH COURT OR THAT ANY SUIT, ACTION, OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. SERVICE OF PROCESS, SUMMONS, NOTICE, OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH IN <u>SECTION 12</u> SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION, OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. **THE PARTIES KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, EMPLOYEE'S EMPLOYMENT WITH THE COMPANY, OR THE TERMINATION OF EMPLOYEE'S EMPLOYMENT WITH THE COMPANY.**

(e)     The Parties acknowledge and agree that the Company may withhold from any amounts payable under this Agreement such federal, state, local, and foreign taxes and withholdings as may be required to be withheld pursuant to any applicable law, rule, or regulation.

(f)     This Agreement shall not be assignable by Employee, but shall be binding upon Employee and upon Employee's heirs, administrators, representatives, executors, and successors. This Agreement shall be freely assignable by the Company without restriction and, without limiting the foregoing, shall be deemed automatically assigned by the Company with Employee's consent in the event of any sale, merger, share exchange, consolidation, or other business reorganization. This Agreement shall inure to the benefit of the Company and its successors and assigns.

(g)     Each Party hereto agrees to pay the reasonable attorneys' fees, court costs, and other costs of collection or enforcement of the substantially prevailing Party incurred in enforcing the terms of this Agreement in the event of a violation of the terms or covenants contained herein.

(h)     Notwithstanding anything in this Agreement to the contrary, the Company intends that income paid to Employee pursuant to this Agreement will be exempt from or comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), such that the amounts will not be subject to taxation under Section 409A of the Code, and the provisions of this Agreement shall be interpreted and construed accordingly. However, the Company does not guarantee, and Employee hereby acknowledges and agrees that the Company does not guarantee, any particular tax effect for income provided to Employee pursuant to this Agreement. No amount payable to Employee pursuant to this Agreement on account of Employee's termination of employment with the Company which constitutes a "deferral of compensation" within the meaning of Section 409A of the Code and the regulations promulgated thereunder shall be paid unless and until Employee has incurred a "separation from service" as

defined in Section 409A of the Code. In the event that Employee is a "specified employee" as defined in Section 409A of the Code as of Employee's termination, any payment due to Employee that is payable upon termination will be delayed for a period of six (6) months to the extent required to avoid the imposition of income taxes on Employee under Section 409A of the Code, and any delayed payments instead will be paid in a lump sum on the date that is seven (7) months following termination.

(i)       The section headings used in this Agreement are included solely for convenience, and shall not affect, or be used in connection with, the interpretation of this Agreement.

(j)       In the event that any term(s) of this Agreement conflicts with a term(s) of any employee handbook, policy, practice, or procedure adopted or maintained, at any time, by the Company, the term(s) of this Agreement shall control and supersede such conflicting term(s).

(k)       This Agreement may be executed in any number of counterparts each of which shall constitute an original and taken as a whole shall constitute one and the same agreement. Further, an original signature may be obtained electronically or through facsimile signature.

(l)       By signing below and as a condition of Employee's employment with the Company, Employee acknowledges and agrees that: (i) Employee's employment with 3G was terminated effective as of immediately prior to the Effective Date, Employee voluntarily resigned such employment with 3G, and Employee hereby waives any claims in connection with such termination; (ii) all prior employment, independent contractor, or similar agreements (whether written or verbal) between Employee, on the one hand, and 3G, on the other hand, (collectively, the "Prior Agreements"), together with all of Employee's rights under the Prior Agreements, are hereby terminated as of immediately prior to the date hereof and Employee hereby waives any claims thereunder; (iii) any notice that may be required in connection with the termination of the Prior Agreements is hereby waived; (iv) notwithstanding the termination of the Prior Agreements, the provisions of the Prior Agreements that impose confidentiality, non-disclosure, non-solicitation, or other similar obligations on Employee and that are either between Employee, on the one hand, and 3G, on the other hand, or are otherwise enforceable by 3G (the "Existing Restrictive Covenants") shall continue in full force and effect in accordance with their respective terms to the full extent that they are enforceable under applicable law and Employee agrees to strictly abide by such provisions, except as necessary in order to perform Employee's duties on behalf of the Company; (v) the right to enforce the Existing Restrictive Covenants has been acquired by the Company under the terms of the Purchase Agreement and Employee hereby consents to the assignment of the Existing Restrictive Covenants to the Company and to the Company enforcing the Existing Restrictive Covenants; (vi) the other provisions of the Prior Agreements shall continue in effect to the extent necessary to permit the Company or its successors or assigns to enforce the Existing Restrictive Covenants; (vii) 3G is solely responsible for paying Employee's final wages (including payment for accrued and unused paid time off); (viii) if Employee has any concerns or disputes relating to Employee's final wages or to any other matter relating to Employee's employment with 3G, Employee must raise such matter with 3G; and (ix) Employee hereby waives any right to seek relief or compensation relating to Employee's employment with 3G from any member of the Company Group.

(m)    Upon the termination or expiration of this Agreement, Sections 7 through this Section 14 shall survive such termination or expiration, and shall continue, with full force and effect, in accordance with their respective terms and conditions.

[SIGNATURE PAGE FOLLOWS]

FILED: MONROE COUNTY CLERK 06/11/2025 09:44 AM

INDEX NO. E2025012925

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 06/11/2025

DocuSign Envelope ID: A129D6DE-2645-4B04-83AG-4Z6CA6C314BD

Case 6:25-cv-06307-EAW    Document 2-1    Filed 06/12/25    Page 36 of 71

The Parties are signing this Agreement as of the Effective Date.

IMPERIAL BAG & PAPER CO. LLC

By: _Paul M. Cervino_____

Paul M. Cervino

Its:     Chief Administrative Officer

_____

John Siciliano

Case 6:25-cv-06307-EAW    Document 2-1    Filed 06/12/25    Page 37 of 71

The Parties are signing this Agreement as of the Effective Date.

IMPERIAL BAG & PAPER CO. LLC


By: _____
       Paul M. Cervino
Its:    Chief Administrative Officer


*John Siciliano*
_____
John Siciliano

## SCHEDULE A

INVENTIONS OR WORK PRODUCT EMPLOYEE MADE PRIOR TO THE COMMENCEMENT OF EMPLOYEE'S EMPLOYMENT WITH THE COMPANY, IN WHICH EMPLOYEE HAS AN OWNERSHIP INTEREST, WHICH IS NOT THE SUBJECT MATTER OF ISSUED PATENTS OR PRINTED PUBLICATIONS:

      (If there are none, please enter the word "NONE")

**NONE.**

NOTE:  Please describe each such Invention or Work Product without disclosing trade secrets, proprietary, or confidential information.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

[Attach additional sheets if more space is needed.]

| From: | John Siciliano |
| To: | Vivek Thiagarajan |
| Subject: | Fw: Imperial Dade - Reminder Letter |
| Date: | Tuesday, May 27, 2025 4:04:18 PM |
| Attachments: | Siciliano - Reminder Letter.pdf |
| | 07. Imperial_3G - Employment Agreement (J. Siciliano) (Executed) (003).pdf |

----- Forwarded Message -----
**From:** Joshua Brand <jbrand@imperialdade.com>
**To:** jackerpak@aol.com <jackerpak@aol.com>
**Sent:** Wednesday, May 21, 2025 at 02:29:22 PM EDT
**Subject:** Imperial Dade - Reminder Letter

Mr. Siciliano,

On behalf of Imperial Dade, please see the attached correspondence.

Sincerely,

**Joshua Brand**

**Assistant General Counsel**

Imperial Dade

5901 West Side Ave., 7th Fl.

North Bergen, NJ 07047

jbrand@imperialdade.com

O: 201-437-7440 Ext. 3198

M: 215-917-2311



© 2021 Imperial Dade. All rights reserved. This communication, including attachments, is for the exclusive use of addressee as directed by Imperial Dade and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.

**PLEASE PRINT RESPONSIBLY**

INDEX NO. E2025012925
RECEIVED NYSCEF: 06/11/2025



**Joshua Brand**
Assistant General Counsel
Imperial Dade
5901 West Side Ave., 7th Fl.
North Bergen, NJ 07047
201.437.7440 Ext. 3198
jbrand@Imperialdade.com

May 21, 2025

**VIA Email and Federal Express**

John Siciliano
1 Cali Ridge
Fairport, NY 14450
jackerpak@aol.com

Re:      **Your Continuing Legal Obligations to Imperial Dade**

Dear Mr. Siciliano,

I am in-house legal counsel at Imperial Dade. As you know, your employment with Imperial Dade terminated effective May 21, 2025.  I write to remind you of your continuing obligations to Imperial Dade as set forth in the Employment Agreement ("Agreement") which you executed at the commencement of your employment. A copy of the Agreement is enclosed.

As you know, the Agreement sets forth various restrictive covenants on your activities following your termination from employment for a period of twelve months ("Restricted Period"). These restrictions are summarized below and set forth fully in the enclosed Agreement. They prohibit you from engaging in any of the following activities during the Restricted Period:

- Directly or indirectly, whether as a principal, director, employee, agent, distributor, representative, equity holder, or otherwise, participate in, work for, or provide services to any position or role with a Competing Business (as defined in the Agreement) in any geographic area that is located within 100-miles of the office where you primarily worked on behalf of the Company Group.  (Agreement, ¶ 9(b)).

- Directly or indirectly (a) solicit, divert . . . or accept, for your benefit or on behalf of any other person or entity, business related to any Competitive Services from any Covered Customer, as those terms are defined in the Agreement or (b) solicit, induce, influence, or encourage, any Covered Customer or any Company vendor or supplier to terminate or diminish its relationship with any member of the Company Group. (Agreement, ¶ 9(c)).

Case 6:25-cv-06307-EAW    Document 2-1    Filed 06/12/25    Page 41 of 71

Page 2

- Directly or indirectly solicit, induce, or cause any Company Group member's employees to leave such Company Group member's employ for any reason, including without limitation, to work for Employee or any Competing Business, or otherwise be directly or indirectly involved in hiring a person away from any member of the Company Group. (Agreement, ¶ 9(d)).

The Agreement also prohibits you from "maki[ng] or otherwise publish[ing] in any format or on any platform any remarks or statements about the Company Group, the Company Group's products or services, or the Company Group's employees, officers, or equity holders, which are likely to cause harm to any of them . . . ." (Agreement, ¶ 9(e))."

Finally, with respect to Confidential Information (as defined in the Agreement), you are prohibited from (a) using Confidential Information for your personal benefit, for the benefit of any other person or entity, or in any manner adverse to the interests of member of the Company Group or (b) disclosing Confidential Information to any person or entity outside of the Company Group, except with the Company's prior written consent. The Agreement also requires that you return any and all Confidential Information in your possession to the Company immediately upon your termination. (Agreement, ¶ 8(a)(i)-(iv)).  To the extent you have not returned all Confidential Information in your possession, we request that you do so immediately upon receipt of this letter by sending it to me at the address above without retaining any copies for yourself.

Be advised that Imperial Dade takes each of the obligations in your Agreement seriously and expect you will adhere to them.  The Agreement provides Imperial Dade with the right to seek both monetary and injunctive relief to redress any harm caused by any breach of the Agreement. It also entitles Imperial Dade to recoup its reasonable attorneys' fees in connection with pursuing any action involving your breach of the Agreement.

Thank you for your anticipated cooperation.

Sincerely,

Joshua Brand
Assistant General Counsel
Enclosure

FILED: MONROE COUNTY CLERK 06/11/2025 09:44 AM

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 06/11/2025





May 21,2025

VIA USPS

John Siciliano
1 Cali Ridge
Fairport, NY 14450

Dear John Siciliano,

This letter is to confirm your employment status with Imperial Bag & Paper Co., LLC dba Imperial Dade at our Rochester, NY facility Your employment has ended effective **May 21,2025**. Separation is due to misconduct.

Due to separation, any company sponsored benefits you may have had will be affected as follows:

- Your final check will be issued as soon as feasible.
- Your Medical, Dental and Vision coverage will end **May 31,2025.**
- Your United Concierge Medicine Coverage will end **May 21,2025.**
- Expect a package regarding continuation of healthcare benefits (COBRA) within the next 14 business days. **Optum Financial is our Cobra Administrator**, their number is 833-582-2588, they are available Monday-Friday 7am-7pm CT. or via ADPcompcobraAM@healthaccountservices.com
- Basic Life and AD&D coverage ended on **May 21,2025**. Basic Life and AD&D can be ported (direct bill), please contact Guardian National Conversion Dept. directly at 800-433-5982 option 1 x 5696.
- Voluntary Life Insurance coverage ended on **May 21,2025**. Voluntary Life Insurance provides the option to port these policies within 30 days, please contact Guardian's National Conversion Dept. directly at 800-433-5982 option 1 x 5696
- Your 401(k) ended **May 21,2025.** Please allow one week after your final payment is issued before withdrawing/rolling over your account. You may contact Fidelity directly at 800-294-4015.
- Your Aflac disability ended **May 21,2025**, cancer, and accident policies are portable, please reach out to Aflac directly to arrange direct billing for your Accident policies. The number is 800-992-3522.
- All company property must be returned before final payment is issued, this includes Laptops, phones, access cards/ids, etc. Failure to return company property may require the cost of the items to be charged back to you in accordance with applicable law.
- Your 2025 tax forms will be mailed to the address on record before January 31, 2026; your 2025 tax forms will be mailed to address of record, please contact us in the event your address changes before January 15, 2025, or you may call *MyLife Advisor at 855-547-8508*, Mon – Fri, 8:00 am – 11:00pm EST.
- If applicable - you may file for unemployment at your earliest convenience, please mention Imperial Dade as the employer of record, FIEN 20-5963953.

We wish you the best of luck in your future endeavors!

Sincerely,

Jessica Weining
Human Resources Supervisor

Vivek Thiagarajan Esq.
Attorney-At-Law
1088 Bay Road, Webster, NY 14580
804-432-1576
Vivek@Neutral.Law

To:
Joshua Brand,
Assistant General Counsel
Imperial Dade
5901 West Side Ave., 7th Floor
North Bergen, NJ 07047
JBrand@ImperialDade.com
(Sent Via email and U.S. Mail)

June 3, 2025

### DEMAND AND DOCUMENT PRESERVATION NOTICE

Mr. Brand:

Our office represents Mr. John Siciliano ("Mr. Siciliano"), a former employee of Imperial Dade (the "Company"). Our client received a letter dated May 21, 2025 (the "Termination Letter") which states that his employment has ended "due to misconduct" effective May 21, 2025. We are also in receipt of a separate letter from your office reminding my client of the non-compete provisions in the Employment Agreement despite my client receiving no severance or other separation benefit.

Please accept this letter as a formal demand for my client's entitlements under his employment agreement. This letter also serves as formal notice to preserve any and all documents in the event that litigation is necessary to resolve this dispute, including any paper documents, digital documents, video camera footage (whether security footage or otherwise), correspondence (whether written or digital), and any and all internal documents of the Company relevant to the matters at hand.

### THE COMPANY IS IN BREACH OF THE EMPLOYMENT AGREEMENT FOR TERMINATION OF MR. SICILIANO WITHOUT PROVIDING HIM HIS CONTRACTUAL RIGHTS TO SEVERANCE BENEFITS

Please take notice that the Company is in breach of the employment agreement entered into by the parties on May 15, 2024 (the "Employment Agreement"). The Termination Letter attempts to terminates my client for cause. In doing so, the Termination Letter attempts to rely on "misconduct" pursuant to Section 6(a)(ii) of the Employment Agreement. However, such section

does not apply to Mr. Siciliano, and the Company has failed to provide any evidence of "personal misconduct which interferes with or jeopardizes the business of any member of the Company Group" which is the definition of "cause" pursuant to Section 7(c) of the Employment Agreement. Instead, the Company merely alleges vague misconduct that fails to qualify under this section. This is especially concerning in light of the prior conduct of Oscar Garcia ("Mr. Garcia") towards my client in his actions as agent for the Company and as Mr. Siciliano's supervisor in upper management. Mr. Garcia has a history of bringing up how much more my client was making than upper management and, according to my client and his manager—Vincent Stango—Mr. Garcia seemed to take issue with this and sought to have the Company get rid of my client. Upper management—through Mr. Garcia—also had a history of denying my client raises, even those that had been approved by lower levels of management. As the Northeast Manager who oversees nine locations, the actions of Mr. Garcia towards my client—whether intended personally or corporately—are considered actions of the Company for which the Company is liable and responsible.

It is worth noting that two other managers—both of whom were aware of the incident that Mr. Garcia referenced as a pretext for the termination—were not let go or otherwise negatively impacted. Attached hereto is a copy of an email sent from my client's manager regarding these issues. My client appears to have been wrongly targeted by the Company through the actions of Mr. Garcia. The Termination Letter appears to have been the execution of the Company's targeted plan—executed by Mr. Garcia—but without any justification or clarification provided. The letter simply stated that the separation was due to vague "misconduct" without qualification or explanation of what such misconduct was, how it qualifies as personal misconduct, much less how such conduct jeopardizes or interferes with the business or a member of the company group.

Having failed to properly allege much less prove cause, the controlling provision for Mr. Siciliano's payout should be Section 7(a)(i-vi) of the Employment Agreement ( termination without cause). As such, he is entitled to the following:

1.  Any performance bonuses for the current calendar year;
2.  Any salary earned but unpaid;
3.  Any earned but unused vacation days or paid time off;
4.  Accrued and unpaid employee benefits;
5.  The opportunity to sign a separation agreement which would entitle him to equal installments of his then-current salary for the remainder of the Term, in addition to an extra 6 months, totaling approximately twenty-four months (May 2025 through May 2027) and an additional six (6) months for a total of thirty months at a pro-rated rate of $27,500 per month, totaling approximately $825,000.00, plus all applicable benefits, bonuses, wrongly denied raises, and other compensation as provided in the Employment Agreement.

In wrongfully terminating my client, not only was he deprived of the above benefits, but he was also deprived of stock options that he was entitled to in the amount of approximately $100,000.00. As the termination does not fit the definition of "cause" it is a wrongful termination in violation of the contract. As such, please provide my client with the value of his full entitlements as listed above, including the opportunity to sign a formal separation agreement which formalizes his access to the contractual rights listed above, including ongoing payments of his current salary,

FILED: MONROE COUNTY CLERK 06/11/2025 09:44 AM
NYSCEF DOC. NO. Case 6:25-cv-06307-EAW    Document 2-1    Filed 06/12/25    Page 46 of 71

INDEX NO. E2025012925
RECEIVED NYSCEF: 06/11/2025

earned vacation days, performance bonuses, accrued benefits, and stock options totaling approximately $1,000,000.00. Failure to do so will result in legal action for breach of contract.

## THE COMPANY IS PREVENTING MR. SICILIANO FROM MAKING A LIVING BY ENFORCING AN UNREASONABLE NON-COMPETE WITHOUT CONSIDERATION

In addition to denying Mr. Siciliano access to his contractual severance benefits, the Company is now preventing him from making a living at all. The covenant not to compete contained in Section 9(b) of the Employment Agreement imposes an unreasonable and overly broad restriction that effectively prevents Mr. Siciliano from working in his field for a calendar year within 100 miles of the office, which under New York law constitutes an unenforceable restraint of trade. This is particularly devastating given the Company's failure to provide any consideration for such restraint in the form of severance payments or other benefits under the contract. This makes it a near impossibility for Mr. Siciliano to make a living and support his family as the Company is also revoking his contract benefits, including his healthcare, life insurance benefits, and income.

Please provide a written confirmation—signed by a member of the Company—which revokes each and every restrictive covenant contained in Section 9 of the Employment Agreement, lest my client be unable to work in his field for an entire calendar year. If we do not receive written assurances that the non-compete will be revoked and not enforced, my client will be forced to file for injunctive relief with the courts to acquire an immediate Temporary Restraining Order, preventing the enforcement of the non-compete cited in your prior letter.

## THE COMPANY IS IN POSSESSION OF MR. SICILIANO'S PERSONAL PROPERTY AND IT MUST BE RETURNED

When Mr. Siciliano was terminated as expressed above, he was not given an opportunity to clean out his desk of personal items. While he was assured in writing by a representative of the Company after the fact that his items would be cleared out and shipped to him, there are missing items of significant personal and monetary value belonging to Mr. Siciliano, which the Company is legally obligated to return under New York property law. It is especially concerning that Mr. Garcia—who as my client's supervisor had expressed disdain for my client and his supervisor— not only had knowledge of these items and their location, but had been found going through my client's desk and making comments to other staff regarding its contents, including medical supplies necessary to my client.

As such, please discuss these issues with Mr. Garcia immediately and provide all of Mr. Siciliano's personal property that was in his desk to him immediately. If such items are not received within the next ten (10) days, my client will be forced to pursue all available legal remedies, to recover his property or in the alternative seeking damages for the full replacement value of all items. We hope that it does not come to this, but my client needs to preserve any and all legal rights available to him, and if this cannot be resolved amicably, actions must be taken.

My client does not wish to be litigious or adversarial about this situation, however, his rights and livelihood are at significant risk and without prompt action, they will cause him harm and prejudice.

FILED: MONROE COUNTY CLERK 06/11/2025 09:44 AM
NYSCEF DOC. NO. Case 6:25-cv-06307-EAW    Document 2-1    Filed 06/12/25    Page 47 of 71    INDEX NO. E2025012925

RECEIVED NYSCEF: 06/11/2025

Please provide a prompt response to this letter. I am available to discuss this by phone at 804-432-1576 if you want to try to work out a resolution.

Sincerely,

Vivek Thiagarajan, Esq.

*Sent with attachment*

On Friday, May 30, 2025, 10:08 AM, Vince Stango <vs@stangoassoc.com> wrote:

Joe,

From NYS website:

In New York State, employers are generally required to pay out unused vacation time when an employee's employment is terminated, unless there's a specific policy or agreement in place that allows for forfeiture. However, this may depend on whether the employer has a written policy stating that vacation time is forfeited upon termination and if the employee was informed of that policy in advance.

Here's a more detailed explanation:

- **New York law requires employers to pay final wages, including any accrued vacation time, upon termination.**

- **Employers can have written policies about vacation time, but these policies must be clear and communicated to employees.**

- **If there's no written policy, the employee is entitled to payment for accrued vacation time.**

- **Employers may be able to prevent payouts for unused time if they have a policy in place that clearly states that employees lose their accrued vacation time under certain conditions.**

- **For a forfeiture policy to be effective, it must be communicated to employees in advance and they must be aware of it.**

FILED: MONROE COUNTY CLERK 06/11/2025 09:44 AM
NYSCEF DOC. NO. Case 6:25-cv-06307-EAW    Document 2-1    Filed 06/12/25    Page 49 of 71

INDEX NO. E2025012925
RECEIVED NYSCEF: 06/11/2025

- 

**Disputes about unused PTO can arise, and employers and employees should follow their company's dispute resolution procedures.**

Unless I missed it in my employment agreement, It was never communicated to me. As such, accrued vacation time needs to be paid out. Otherwise, I will call NYS to file a complaint.

Also, cause is based on your investigation only! I did not do anything wrong on my end but respect the employees request to not report it. I also never received any training from ID on the subject matter that would have made it clear that we must report it regardless what action the employees wanted us to take. She told John as a friend and not as his supervisor.

Lisa Burton stated to both John and I that there would be no retaliation against anyone other than what was being investigated on Carmen. Otherwise, we could have requested a lawyer to be present during the investigation. She also said she was not recording it but just taking notes for ID.

**In addition, there were two other managers that knew before John and I were told that are still employed by ID. It appears that standard protocol is not being followed and John and I were targeted.**

I believe that John followed appropriate protocol. John did exactly what the other managers did that were also informed. Stephanie had told Jeremiah. Jeremiah then pulled John in on the conversation he had with Stephanie and they told him about the incident. John then told me about the incident. At that point, I asked John to find out if Stephanie was telling him as a friend or as his supervisor. After Stephanie talked to security at Turning Stone, she told John that she did not want to have him take any action and was communicating it to him as a friend. **When John told me that, I respected her wishes and did not report it to ID. Therefore, the responsibility for all this should fall on me only for not reporting it.** Karen Lilly, Jeremiah and John all knew about it and reported it to their appropriate supervisors.

By terminating just John and I for misconduct is not consistent or showing standard protocol across the board for misconduct. It looks like John was targeted based on his unusual high salary. Oscar had reminded me several times that John was making more than him and seemed to have a hard time accepting this. I remember telling him over dinner that I hope he had stock options in ID that would pay off when ID went public. By the looks of it, ID appears to be targeting two senior managers to reduce their payroll expenses due to the slowdown in their resturant supply business. Oscar had communicated this to me several times on the slowdown in the ID business and that they needed to manage the business at the expense level.

**In addition, please keep in mind that John or I have not been officially trained by ID on how to handle sexual harassment during the one year period that we were employed. I was under the assumption that if an employee told me as a "friend", then I would respected their wishes. We were a small company of 30 people so we have become friends during our times together.**

I had communicated to Lisa Burton that I was not going to breech the confidential information that Stephanie had told John as a "friend".

Anyways, I am open to discussing this further with either you or your corporate attorney.

Vince

Sent from my iPhone









*IMPERIAL BAG*
*& PAPER CO. LLC*
*("IMPERIAL DADE")*

*CODE OF CONDUCT*
*& BUSINESS ETHICS*
*(THE "CODE OF CONDUCT")*

Please visit https://imperialdade.com/about-us for the most up-to-date version of the Imperial Bag & Paper Co. LLC ("Imperial Dade")
Code of Conduct and Business Ethics.

Case 6:25-cv-06307-EAW    Document 2-1    Filed 06/12/25    Page 52 of 71

# *MESSAGE FROM JASON TILLIS*



Dear Imperial Dade Employees:

Imperial Dade is a rapidly growing company with strong roots, grounded in a commitment to conduct business with the utmost integrity and respect. We strive to manage every aspect of our business ethically and in compliance with the law. This Code of Conduct and Business Ethics (the "Code of Conduct") sets forth the foundational principles that apply to all of us in our work. These principles are designed to foster relationships of trust and respect with our employees, customers, suppliers, government authorities, and communities at large.

The Code of Conduct also serves as a reminder to all employees to speak up if you see something that does not seem right. Every Imperial Dade team member is responsible for ensuring that our actions are consistent with the company's mission and values. This is critical to protecting our reputation, our partners' confidence in our business, and our financial strength.

Please read the Code of Conduct carefully and follow it completely. Compliance is our shared responsibility, and I thank you for all that you do every day to continue to live up to these high standards of professionalism and business ethics.

Sincerely,

Jason Tillis, Chief Executive Officer

# WHO WE ARE

Imperial Dade is the leading independently owned and operated distributor of foodservice packaging, facilities maintenance supplies, floor equipment, and industrial packaging in North America. A provider of customized supply chain solutions, Imperial Dade serves customers in many business-to-business market segments. Our growing network of strategically located distribution centers serves tens of thousands of customers, with thousands of dedicated employees striving to exceed customer expectations.



# MISSION AND VALUES

At Imperial Dade, our customers' success has always been at the core of our strategies, decisions, and investments. Our mission is to bring quantifiable value to each customer's operations, providing the best possible solutions through products and services.

## Ethics
We conduct business in an ethical, legally compliant, and responsible manner with all stakeholders.

## Communication
We communicate with our employees in a clear, consistent manner ensuring that company goals, results, and policies are understood and that our employees have the information they need to succeed.

## Respect
We respect the rights and opinions of all stakeholders and treat each person as a valued partner.

## Trust
We build trust among all stakeholders and hold ourselves accountable to do the right thing.

## Openness
Our company culture encourages employees to share their ideas and suggestions. Our open-minded management team is given the flexibility to make changes to improve operations and anticipate the changing needs of our customers.

# *IMPERIAL DADE IS A WORKPLACE OF BELONGING*



We believe that when people feel they belong, they thrive. We know that different perspectives lead to better ideas. That is why building an inclusive culture is key to our continued success at Imperial Dade.

| | | |
|---|---|---|
| Respect is expected | Communication is honest | People are empowered |
| Uniqueness is valued | Success is a team sport | |



# TABLE OF CONTENTS

Message from Jason Tillis .........................................1

Who We Are ...............................................................2

Mission and Values ..................................................3

Table of Contents .....................................................5

Commitment to Integrity: An Overview ......................6

Compliance Is a Shared Responsibility .....................7

  - Reporting Obligations

  - No Retaliation

  - Violations

Our Workplaces .......................................................8

  - Keeping Workplaces Safe, Secure, and Healthy

  - Fostering a Workplace of Belonging

  • Diversity and Equal Employment Opportunity

  • No Discrimination or Harassment

  • Hiring Practices

  • Consultants and Representatives

Our Business .........................................................11

  - Dealing Fairly and Honestly

  - Compliance with Laws and Contractual
    Requirements

  - Certifications and Other Statements to the
    Government

  - Avoiding Conflicts of Interest

  - Prohibition of Improper Payments

  - Supplier Relations

  - Political Contributions

    • Contributions

    • Employee Political Activities

  - International Business

  - Antitrust Laws

  - Exchange of Information with Competitors

  - Keeping Accurate Records

  - Safeguarding Company Assets, Confidential and
    Proprietary Information, and Technology

Our Communities ...................................................18

  - Protecting the Environment

    • Product Sourcing

    • Minimizing Environmental Impacts of Our
      Facilities and Fleet

    • Supplier Expectations

    • Employee Expectations

  - Contributing to Our Communities and Causes

Compliance and At-Will Employment Status ............20

FILED: MONROE COUNTY CLERK 06/11/2025 09:44 AM
NYSCEF DOC. NO. 8

INDEX NO. E2025012925
RECEIVED NYSCEF: 06/11/2025

# COMMITMENT TO INTEGRITY: AN OVERVIEW

Imperial Dade is committed to integrity as the cornerstone of the way the company does business. We are bound to our employees, customers, suppliers, business partners, and communities to conduct our business in an ethical and legal manner. This requires that we:

- Make only true statements about our products, services, and capabilities
- Respect the rights of all employees to fair treatment and equal opportunity, free from discrimination or harassment of any type
- Know, understand, and comply with the laws, regulations, and policies governing the conduct of our business
- Ensure that all transactions are handled honestly and recorded accurately
- Protect information that belongs to the company, our employees, customers, suppliers, and other partners

- Avoid conflicts of interest, both real and perceived
- Never use company assets or information for personal gain
- Recognize that even the appearance of misconduct or impropriety can be very damaging to Imperial Dade's reputation and our ability to conduct business, and avoid all impropriety and appearance of impropriety



# COMPLIANCE IS A
# SHARED RESPONSIBILITY

Compliance with the Code of Conduct is mandatory. This means not only taking personal responsibility for doing the right thing but also speaking up about others' conduct that might violate the Code of Conduct, company policies, or any law.

### Reporting Obligations

If you have a good faith belief that a potential violation of the Code of Conduct has occurred, you must report the incident promptly to your supervisor, Imperial Dade Legal (at Legal@ImperialDade.com), or the Imperial Dade Confidential Employee and Supplier Hotline (the "Hotline"). The Hotline is managed by an independent third-party and provides online and phone-based methods for reporting concerns. Employees may contact the Hotline on a confidential basis, and confidentiality will be maintained to the extent possible. Neither Imperial Dade nor our third-party provider will reveal the name of an employee making a report to another employee who is the subject of a report, except as required by applicable law. Further, the Hotline enables anonymous reporting of concerns. We encourage you to provide your name because that allows us to ask follow-up questions to ensure the incident is fully investigated and understood; typically, this also enables us to address the incident most expeditiously. While it is helpful, therefore, it is not necessary to give your name when reporting an incident.

> **If you see something, say something**

To make a report via the Hotline, you can call 800-461-9330 or visit www.imperialdade.com/hotline. You can make a report 24 hours a day, seven days a week.

### No Retaliation

Imperial Dade prohibits any form of discipline, reprisal, intimidation, or retaliation for reporting a potential violation of the Code of Conduct or cooperating in related investigations, provided that the report is made in good faith and with a reasonable belief that the information submitted is true. Anyone who engages in any such retaliation will be subject to disciplinary action, up to and including termination of employment.

### Violations

Employees who fail to comply with the Code of Conduct, fail to report a potential violation of the Code of Conduct, deliberately withhold information concerning a potential violation of the Code of Conduct, fail to cooperate with an investigation of a potential violation, or who knowingly make a false report may be subject to disciplinary action, up to and including termination of employment and appropriate legal action.



# OUR WORKPLACES

Our employees are our greatest assets. Each day, we strive to keep our workplaces safe and secure, and to foster an inclusive culture where everyone feels a sense of belonging. Please see the Employee Handbook for more information, including for the company's Equal Employment Opportunity policy, our policy against Sexual and Other Unlawful Harassment, and for more information about working with management and Human Resources partners to answer questions and address concerns.

## Keeping Workplaces Safe, Secure, and Healthy

Imperial Dade's safety program is focused on keeping our workplaces safe, secure, and healthy for all our employees. The program emphasizes shared best practices, training, safety awareness, and eliminating hazards wherever possible. Imperial Dade's safety policies are designed to comply with all applicable laws and regulations, including OSHA and DOT standards.

Imperial Dade also desires to provide a drug-free, healthy, and safe workplace. To promote this goal, while on Imperial Dade premises and while conducting business-related activities off company premises, no employee may use, possess, distribute, sell, or be under the influence of alcohol or illegal

drugs. Unauthorized weapons, or items which could be used, construed, or mistaken as a weapon are not permitted on company property, the worksite, delivery sites, or on the employee's person while performing duties for the company, unless required by law.

Employees are responsible for conducting their work activities in a safe and environmentally responsible manner and for bringing to management's attention any actual or potentially dangerous workplace conditions. Such concerns should be shared with the employees' supervisor or the Imperial Dade VP of Safety promptly.

## Fostering a Workplace of Belonging

Our success depends in great part on maintaining a respectful and inclusive workplace. Respecting diversity of culture, experience, and thought are critical to making Imperial Dade an innovative company with highly engaged employees committed to exceptional customer service. It is our policy and practice that all employees are provided fair and equitable treatment. It is also our policy and practice to employ individuals strictly on the basis of their qualifications for the applicable role, and to place employees in positions that are best suited for their capabilities.

### Diversity and Equal Employment Opportunity

Imperial Dade supports a positive environment in which all individuals may grow, contribute, and participate free from discrimination. We don't just accept differences—we celebrate and support them. Imperial Dade is an equal employment opportunity employer and does not discriminate against any person on the basis of actual or perceived race, creed, color, religion, national origin, ancestry, alienage or citizenship status, age, disability or handicap (including AIDS and HIV), sex or gender, gender identity or expression, pregnancy, marital status (including civil unions), familial status, domestic partnership, atypical hereditary cellular or blood trait, genetic information, liability for service in the United States Armed Forces, veteran status, sexual orientation, or any other characteristic protected by applicable federal, state, or local laws (referred to as "protected status"). Imperial Dade's nondiscrimination policy extends to all terms, conditions, and privileges of employment as well as the use of the company facilities, participation in all company-sponsored activities, and all employment actions such as recruitment, hiring, promotions, upgrading, demotions, downgrading, transfers, lay-off, compensation, benefits, and termination of employment.

### No Discrimination or Harassment

Imperial Dade is committed to providing a work environment that is free from all forms of unlawful harassment. Actions, words, jokes, comments, or other conduct that is harassing, coercive, or disruptive and based on an individual's actual or perceived race, creed, color, religion, national origin, ancestry, alienage or citizenship status, age, disability or handicap (including AIDS and HIV), sex or gender,

gender identity or expression, marital status (including civil unions), familial status, domestic partnership, atypical hereditary cellular or blood trait, genetic information, liability for service in the United States Armed Forces, veteran status, sexual orientation, or any other characteristic protected by applicable federal, state, or local laws will not be tolerated.

Anyone found to be engaging in any type of unlawful discrimination will be subject to disciplinary action, up to and including termination of employment.

### Hiring Practices

Imperial Dade has no prohibition against the hiring of relatives of employees. Decisions regarding hiring, however, may not be influenced by a family or other significant personal relationship. In addition, no employee shall be supervised or in a position in which progress can be influenced by a relative or other such relationship.

Recruitment and employment of current and former U.S. Government employees is governed by complex rules that are subject to change (sometimes called "revolving door" rules). These rules may prohibit recruitment and employment of U.S. Government employees or even discussions of possible employment. There may also be restrictions on the duties current and former government employees may perform as employees, agents, consultants, or other representatives of Imperial Dade.

Former government personnel are subject to federal conflict of interest laws and the rules and regulations of government agencies. Before engaging in any employment discussions with individuals who

currently are, or formerly were, employed by the government, employees must understand these laws, rules, and regulations. Please contact Imperial Dade Legal for advice about proposed recruitment and employment of such personnel.

It is particularly important that potential conflict of interest situations be reviewed and resolved by Imperial Dade Legal prior to any discussions regarding potential employment of current government personnel - including exploratory contacts, recruitment, solicitation, and offer of employment.

**Consultants and Representatives**

Consultants and representatives shall only be retained for proper commercial purposes and in accordance with Imperial Dade policies. Compensation for consultants and representatives will be comparable to that customarily paid in the locale and commensurate with the nature and scope of the service.

Imperial Dade officers, directors and employees may not act as consultants, agents, or representatives for other companies or entities when doing so might present a conflict of interest with such individual's role at Imperial Dade.



# OUR BUSINESS

### Dealing Fairly and Honestly

We compete and win on the basis of excellent service, reliability, and a reputation for integrity. We deal fairly and honestly with our customers, suppliers, and other business partners by:

- Making only true statements about our products, services, and capabilities
- Communicating honestly with our business partners to address challenges
- Never misrepresenting a competitor's products or services
- Advertising in a way that complies with laws and regulations
- Avoiding actual or perceived conflicts of interest
- Following all laws and special requirements related to government contracting and international business and trade
- Never offering or accepting anything that could appear to be a bribe, a kickback, or otherwise inappropriately influence a decision about our business

### Compliance with Laws and Contractual Requirements

All Imperial Dade employees must conduct business in accordance with applicable laws and in a manner designed to comply with all contractual obligations. Employees may not take any actions for the purpose of circumventing such obligations.

In the event Imperial Dade's obligations are not clear under a contract or subcontract or if you have questions about a law or a contractual obligation, you should contact your supervisor or Imperial Dade Legal.

### Certifications and Other Statements to the Government

Employees signing certifications or making other statements to a government entity on behalf of Imperial Dade are responsible for acting diligently and conducting a reasonable investigation, when necessary, to ensure the truthfulness and accuracy of such communications. Inaccuracy or misleading statements can result in criminal and civil penalties for the individual employee and the company. Such certifications and representations should also be reviewed and approved by Imperial Dade Legal pursuant to company policies.

### Avoiding Conflicts of Interest

Imperial Dade respects the right of its employees to manage their financial affairs, to make personal investments and to participate in private commercial enterprise. Employees should not, however, permit their outside interests to interfere with their job duties. A conflict of interest arises when an employee has an interest in any business or property or an obligation to any person that could affect the employee's judgment

in fulfilling his or her responsibilities to Imperial Dade. Accordingly, Imperial Dade employees are expected to refrain from any activity or investment that constitutes, or might appear to constitute, a conflict of interest. In addition to violating the Code of Conduct, a conflict of interest may also lead to criminal or civil liability for the individuals and entities involved.

For example, a conflict of interest may arise if an Imperial Dade employee has a substantial holding in, or a professional affiliation with, a supplier, customer, or competitor. A conflict of interest may also occur when an employee is in a position to influence a decision that may result in a personal gain for the employee or the employee's family member as a result of Imperial Dade's business dealings. A family or other personal relationship with an Imperial Dade supplier or competitor may also present a conflict of interest. Imperial Dade prohibits all employees from using their position with Imperial Dade or Imperial Dade's relationship with its customers, suppliers, or other business partners for private gain or to obtain benefits for themselves, their relatives, their friends, or their private enterprises.

You must disclose to Imperial Dade Legal any outside activity, relationship, or investment in which you are involved or may become involved that is, or has the potential for appearing to be, a conflict of interest. If you require guidance in this area, Imperial Dade Legal should be consulted promptly.

### Prohibition of Improper Payments

The offer, promise, or provision of anything of value to another person, directly or indirectly, with the intent to secure an improper advantage or other benefit for our business is strictly prohibited by the Code of Conduct and applicable laws. All payments and agreements to provide money or anything else of value must be in strict accordance with this Code of Conduct and all applicable laws. Kickbacks, bribes, and other similar improper payments to induce or reward decisions or actions are strictly prohibited. This Code and applicable law also strictly prohibit any payment or exchange of value to an agent, sales representative, consultant, or other third party with knowledge or reason to believe any funds (or other items of value) provided will be used for an improper payment or otherwise in violation of this Code or applicable law.

No company employee may make or offer to make direct or indirect payments or exchanges of anything of value (e.g., compensation, gifts, employment opportunities, or contributions) to any persons or firms employed by or acting on behalf of a customer (private or governmental) for the purpose of rewarding favorable actions in a transaction. All employees and management should exercise sound judgment and discretion when seeking authorization for or approving business expenses. When there is any doubt about the permissibility of a payment or any exchange of value under this Code of Conduct or applicable law, you should consult with Imperial Dade Legal.

U.S. Government personnel are prohibited, with limited exceptions, from accepting gifts, gratuities, or entertainment from contractors. Similar rules apply to many state and municipal employees. Imperial Dade supports these rules and employees

are expected to comply with both the letter and spirit of these directives. The company and its employees must avoid any situations which could be viewed as attempts to evade the requirements imposed on military and civilian government employees. Generally speaking, government employees may accept modest refreshments (e.g., coffee and donuts) incidental to a business meeting. Imperial Dade employees are prohibited from offering government employees anything beyond such modest offerings without prior approval from Imperial Dade Legal.

For the sake of clarity, all employees are prohibited from making or offering to make direct or indirect payments or exchanges of anything of value (e.g., compensation, gifts, or contributions) to any governmental officials, political parties, or officials of a party or candidate for political office, for the purpose of rewarding favorable actions or influence of the official, party or candidate.

To ensure compliance with the Code of Conduct and legal requirements, ordinary and reasonable business meal, entertainment, gift, and travel expenses should be made only in accordance with Imperial Dade's compliance policies and procedures.

Any employee who is asked to authorize, make or agree to a payment that may be contrary to the Code of Conduct must immediately report the payment to their supervisor or Imperial Dade Legal. Similarly, if an employee learns that another employee is making or offering to make improper payments or exchanges of value, the employee must immediately report the conduct in accordance with this Code of Conduct. Imperial Dade will promptly and thoroughly investigate all concerns regarding such improper

payments and determine what action should be taken, up to and including termination of employment and appropriate legal action.

## Supplier Relations

Imperial Dade employees are also prohibited from accepting anything of value from a supplier or other business partner, except in accordance with Imperial Dade's compliance policies and procedures. These procedures generally permit acceptance of gifts of nominal value (e.g., swag bag from a conference; t-shirt bearing the supplier's logo) from a supplier or other business partner.  Gifts of larger value must be reported to your supervisor for evaluation under this Code of Conduct and applicable laws. If there is any doubt about the value or the advisability of accepting a gift or anything of value, ask your supervisor or Imperial Dade Legal.

Invitations to social events, working luncheons or other business-related events are to be evaluated individually on their merit as a business activity. If there are sound business reasons for accepting, you may do so with the knowledge and consent of your supervisor.

In connection with federal contracts or subcontracts, federal law prohibits "kickbacks," under which money or anything of value is directly or indirectly provided or offered to or solicited by employees of a contractor or subcontractor for the purpose of improperly obtaining or rewarding favorable treatment. Accordingly, favors may not be solicited, and if you are offered any favors, you must decline them and report the incident to your supervisor.

All employees, particularly those involved in the procurement of supplies or services on behalf of

the company, must avoid even the appearance of impropriety.

## Political Contributions

Imperial Dade will not make any contributions to any political party or candidate for political office in violation of federal or state law.

### Contributions

Political contributions to federal election campaigns made directly or indirectly from Imperial Dade funds are prohibited. The legality of political contributions to state or local campaigns or causes must be determined on a state-by-state basis and, therefore, must be approved in advance by Imperial Dade Legal. Political contributions include any donation, gift, or loan of company funds, assets, or property, directly or indirectly, to or for the benefit of any political party, committee, or candidate, and any use of company funds, assets, or property, directly or indirectly, to candidate or officeholder. This includes: (a) donations, gifts, or loans of funds, assets, or property which are made by employees or third persons, such as agents, or consultants, who are reimbursed in any way by the company; (b) the uncompensated use of company services, facilities, or property; and (c) loans, loan guarantees, or other extensions of credit.

### Employee Political Activities

Employees who engage in political activities must do so on their own time as private citizens, not as Imperial Dade representatives. Employees who seek public office may use vacation time or request leaves of absence to campaign or hold office.

## International Business

Imperial Dade's policy is to comply with all applicable import and export control requirements, including, but not limited to, with respect to the United States, the Export Administration Regulations and the various laws, regulations, and rules administered and enforcement by U.S. Customs and Border Protection, as well as other similar foreign laws that may be applicable to a transaction. Imperial Dade also complies with all applicable sanctions, including, but not limited to, those sanctions administered by the Office of Foreign Assets Control and comparable requirements under the laws of other countries that may be applicable to a transaction. All employees, agents, representatives, and other parties acting on our behalf, are required to comply with all applicable import, export, and sanctions laws, regulations, and rules. All international business must be in strict compliance with the Code of Conduct, applicable laws, and Imperial Dade's compliance policies and procedures.

Any individual who violates import, export, or sanctions requirements may be subject to criminal or civil prosecution, up to and including imprisonment. In addition, any employee involved in such activities may be subject to disciplinary action, up to and including termination of employment.

## Antitrust Laws

Individuals who violate antitrust laws are subject to fines and imprisonment, and can also subject the company to liability and reputational harm. Imperial Dade takes compliance with antitrust laws seriously, and will hold employees responsible for abiding by these laws as well.

In compliance with Section I of the Sherman Antitrust Act:

- No employee may enter into an agreement (expressed or implied, formal or informal, written or oral) with any competitor restricting any of the following conditions or business offerings:
  - Prices
  - Cost
  - Profits
  - Offerings of products and services
  - Terms of sale conditions
  - Production or sales volume
  - Production capacity
  - Market share
  - Quote decisions
  - Customer selection
  - Sales territories
  - Distribution methodology

- No employee may enter into an agreement with a purchaser or lessee restricting the right of the purchaser or lessee to determine the price to resell or lease the product in question. Employees may also not enter into such agreements when Imperial Dade is the purchaser or lessee in the agreement.

The following situations may violate antitrust laws under certain circumstances. Employees may not enter into these agreements without consulting Imperial Dade Legal in advance and obtaining clearance to move forward:

- Agreements with customers or suppliers regarding the sales or purchases of reciprocal purchases or sales by customers or suppliers
- Agreements with purchasers or lessees of products of Imperial Dade that would restrict customers from using or reselling products
- Agreements with any party that would restrict all parties involved to manufacture a product or provide a service to a third party

### Exchange of Information with Competitors

Certain communications with competitors may violate antitrust laws, especially when accompanied by actions. Imperial Dade employees are prohibited from discussing information on prices, costs, profits, offerings of products and services, terms of sale conditions, production or sales volume, production capacity, market share, quote decisions, customer selection, sales territories, or distribution methodology with a competitor or another third party acting on behalf of a competitor. If an employee has a question about whether a communication with a competitor would violate the Code of Conduct, the employee should consult Imperial Dade Legal before engaging in the communication.

When participating in trade associations and other meetings with competitors, employees must ensure that such meetings do not violate the prohibitions in the paragraph above and, in the case of trade associations, ensure that such meetings are subject to formal rules established by the trade association to avoid antitrust violations and other improprieties.

Employees must recognize that participating in development and product certification events impacting competitors or suppliers may implicate antitrust concerns. Accordingly, employees must consult with Imperial Dade Legal prior to attending any such event.

## Keeping Accurate Records

Imperial Dade maintains complete and accurate records to help run the business effectively and efficiently, and to provide truthful information about company operations when necessary. From time to time, Imperial Dade must disclose certain records, and it is important for the company to be able to make such disclosures in a timely manner. In addition, failure to keep accurate records may result in a violation of law.

Imperial Dade employees must help maintain the integrity of company records by doing the following:
- Reporting time worked accurately and promptly
- Submitting accurate reimbursement and expense reports, compliant with Imperial Dade's Travel & Entertainment Policy
- Following Imperial Dade retention requirements and other record-keeping procedures and guidelines
- Never using misstatement, exaggeration, or guesswork in our records
- Creating and maintaining books, invoices, expense reports, and receipts that honestly reflect financial transactions
- Recording all assets, liabilities, revenues, expenses, and business transactions completely, accurately, and in a timely manner
- Adhering to applicable generally accepted accounting standards (e.g., US GAAP), internal control standards (e.g., COSO), and all relevant laws and regulations when keeping records
- Responding promptly and accurately to requests for records from internal and external auditors and legal counsel
- Reporting any concern that a record is inaccurate, false, or misleading to your supervisor, the Chief Accounting Officer, or Imperial Dade Legal.

## Safeguarding Company Assets, Confidential and Proprietary Information, and Technology

All Imperial Dade employees are responsible for acting in good faith to keep Imperial Dade assets (including intellectual property) safe from theft, loss, fraud, waste, and abuse. We must also protect confidential and proprietary information entrusted to us by employees, customers, suppliers, business partners, and others. Imperial Dade's policies are designed to comply with privacy, data security, and other laws and industry practices when handling personal and other sensitive information.

All Imperial Dade employees must act responsibly in safeguarding Imperial Dade assets and when handling confidential and proprietary information of Imperial Dade, our employees, customers, suppliers, business partners, and others by:
- Adhering to Imperial Dade's published security and information compliance policies and documents (including those relating to physical security, cybersecurity, and data protection)
- Using information and technology responsibly
- Never allowing unauthorized persons to use company assets
- Locking laptops and all other devices when not in use, and keeping them secure at all times on and off company premises
- Protecting user IDs and passwords
- Making sure all confidential, personal, and proprietary information is kept safe, secure, and out of public view (e.g., sensitive hard copy files must be locked and secure; sensitive digital files must be password protected)
- Collecting, using and sharing personal information only as needed to meet legitimate business purposes and in compliance with applicable law

- Ensuring that information regarding employees or former employees is not given to outside organizations or individuals, and that all inquiries regarding current and former employees are handled by Imperial Dade Human Resources Department
- Reporting abuse or misuse of company assets promptly

Any Imperial Dade employee who suspects the occurrence of an information security incident must report such concern to the employee's supervisor, Imperial Dade Legal, or the Chief Information Officer.

An information security incident includes loss or theft of information or data in the control or custody of Imperial Dade; unauthorized use, disclosure, destruction, alteration or access to such data; or the unauthorized access to or use of, the inability to access, or malicious infection of an Imperial Dade information technology system (e.g., computer, network, storage device).



# OUR COMMUNITIES

Imperial Dade values the communities in which we operate and strives to minimize our environmental impact while promoting products that help businesses reach their sustainability goals. We also encourage our employees to seek opportunities that allow us to contribute positively to society—as individuals and as a company.

## Protecting the Environment

At Imperial Dade, we recognize that our activities may affect the environment, and we do our best to minimize that impact to protect the communities in which we operate. Environmental consciousness has been at the core of how we operate for decades—it informs product sourcing, how we build and maintain our warehouses and fleet, the suppliers we partner with, and how we train our employees.

## Product Sourcing

Since 2005, Imperial Dade has operated our Greensafe™ Program, providing customers with a comprehensive supply chain management program including consulting, product sourcing, fulfillment, and procedural training designed to help businesses reach their sustainability goals. We strive to continuously increase the number of green products in our catalog and provide guidance to customers seeking to transition to greener products.

## Minimizing Environmental Impacts of Our Facilities and Fleet

Imperial Dade seeks renewable sources of energy and strives to reduce electrical, gas, and energy consumption whenever possible. We recycle in both our offices and warehouses, which includes corrugated boxes, shrink wrap, paper, plastics, pallets, furniture, and computer equipment. We are also continuously modernizing our fleet to improve fuel and route efficiency.

## Supplier Expectations

As set forth in Imperial Dade's Supplier Code of Conduct, we expect our suppliers to not only follow all applicable environmental laws, but also to continuously evaluate and improve their environmental practices in areas such as waste reduction, water use, and carbon emissions. Suppliers are expected to report incidents and concerns to Imperial Dade's Hotline.

## Employee Expectations

All Imperial Dade employees are required to follow applicable environmental laws and policies, and to speak up about potential violations or environmental hazards.

### Contributing to Our Communities and Causes

Imperial Dade strives to be a good citizen of the communities in which its facilities are located and to make positive contributions to society.

Among other things, Imperial Dade may encourage or support participation by others—such as suppliers—in community organizations and activities. However, no Imperial Dade employee shall use his or her position with the company to unduly influence or force such participation. Employees who hold public office or serve on commissions or advisory groups should be alert to conflict-of-interest situations and be prepared to abstain from participating in any deliberations or voting on any issues that directly involve Imperial Dade.

All requests for monetary donations (including requests from customers) that are made on behalf of Imperial Dade, or in an employee's official role as an Imperial Dade employee, must be submitted to and approved by Imperial Dade Legal and the VP, Marketing and Communications.



# COMPLIANCE AND AT-WILL EMPLOYMENT STATUS

Failure to comply with the Code of Conduct subjects all Imperial Dade employees to disciplinary action, up to and including termination of employment. Nothing in this Code of Conduct alters your at-will employment status. As an at-will employee, your employment with Imperial Dade may be terminated by you or Imperial Dade, at any time, with or without cause, and with or without notice.

From time to time, Imperial Dade may add to or revise this Code of Conduct to reflect changes in our policies and to incorporate applicable legal requirements and industry standards. Please visit https://imperialdade.com/about-us for the most up-to-date version of the Code of Conduct. Material changes will be communicated to employees.

The Code of Conduct does not apply to communications by employees, not made on behalf of Imperial Dade, concerning a labor dispute or other concerted communications for the purpose of mutual aid or protection protected by the National Labor Relations Act.

Please direct any questions about the Code of Conduct to Imperial Dade Legal.

